**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

| | |
|---|---|
| **SHELLY ANN LEE,** | ) |
| | ) |
|     **PLAINTIFF,** | ) |
| | ) |
| **v.** | )   **CASE NO.: 6:18-CV-00075** |
| | ) |
| **BELVAC PRODUCTION MACHINERY,** | ) |
| **INC.,** | ) |
| | ) |
|     **DEFENDANT.** | ) |

**DEFENDANT'S MEMORANDUM**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Belvac Production Machinery, Inc. ("Belvac" or "Defendant"), by counsel, hereby files its Memorandum in Support of its Motion for Summary Judgment.

**I.**    **SUMMARY OF THE CASE.**

Shelly Ann Lee ("Lee" or "Plaintiff") alleges in this Title VII and Equal Pay Act ("EPA") action that she was paid less as Belvac's "Controller" than her predecessor with that title, Paul DiTomasso, because she is a woman. (Lee Compl. ¶ 11; Counts I, III). Lee further claims she was retaliated against for raising issues of alleged pay inequity and suffered emotional distress sufficient to assert intentional infliction and/or negligent infliction of emotional distress ("IIED" and/or "NEID") claims under Virginia law. (Lee Compl. Counts II, IV, V, VI).

Lee did receive lower pay than DiTomasso when she held the "Controller" title, but her Title VII and EPA discrimination claims fail as a matter of law because DiTomasso is not an appropriate comparator. That is because, as described in more detail below, the Belvac Controller position was formally redefined to narrow its scope between the time DiTomasso served in the role and when Lee later did. As Controller, DiTomasso had responsibility for two

distinct financial functions – transactional accounting, and financial planning and analysis ("FP&A").  By contrast, Lee was given the Controller role after it was redefined, and had responsibility only for transactional accounting matters and _not_ FP&A.  Those FP&A responsibilities require directly executing financial analysis, reporting, planning, and strategy tasks, and therefore made the "Controller" position DiTomasso performed exponentially more complex, and requiring a higher level of skill and experience than the role after it was redefined. For example, the undisputed record shows dozens of specific FP&A tasks that, by Lee's own admission, were required of the Controller role during DiTomasso's time, but not during hers. (Deposition of Paul A. DiTomasso ("DiTomasso Dep."), attached as **Exhibit 1** at 136-45; Deposition of Shelly A. Lee ("Lee Dep.") attached as **Exhibit 2**, at 304-50).  Accordingly, while both held the title of "Controller" at different times, DiTomasso and Lee performed substantially different roles requiring different skills, effort, and responsibilities.

In addition, Belvac based DiTomasso's compensation on his education and certifications, work experience, and specific skills, _not_ his gender.  DiTomasso came to Belvac with a Masters of Business Administration ("MBA"), Certified Management Accountant ("CMA"), Certified Financial Manager ("CFM") and Certified Public Accountant ("CPA") certifications, and over 25 years of strategic financial leadership to publicly traded international manufacturing companies.  (DiTomasso Dep. 8-2; Lee Dep. Ex 18).  Lee had none of these degrees, no strategic financial experience and no prior industry-specific experience.  (Lee Dep. 108-13; Ex. 18).

Lee's retaliation claims also fail because there is no causal connection between her resignation, or any other purported adverse treatment and the complaints she raised concerning her pay.  Finally, Lee's emotional distress tort claims fail because there is no causal nexus between any of Belvac's actions and Lee's purported emotional distress, because any emotional

distress she claims is insufficiently severe, and because the purported conduct is insufficiently "outrageous" to assert actionable claims. The Court therefore should grant Belvac judgment as a matter of law on all claims asserted herein by Lee pursuant to Fed. R. Civ. P. 56.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS.

Headquartered in Lynchburg, Belvac designs and manufactures continuous motion equipment used in cannery operations. (Lee Compl. ¶ 6). At times relevant to this action, Belvac had locations in the UK, Netherlands, Czech Republic, Dubai, and China. (Lee Dep. 61; DiTomasso Dep. 128). Belvac is an operating company ("OpCo") owned by Dover Corporation ("Dover"), a diversified global manufacturer. (DiTomasso Dep. 123-24; Lee Dep. 59-61). Belvac is one of five OpCos that comprise Dover's Refrigeration and Food Equipment segment ("Segment"). (DiTomasso Dep. 123-24, 127; Lee Dep. 60).

### A.   There Are Two Distinct Teams in Belvac's Finance Department: the "Transactional" Accounting Team, and the "FP&A" Team.

As is common among subsidiaries of publicly traded companies like Dover, Belvac's Finance Department is divided between two functional teams: transactional accounting and Financial Planning & Analysis (or "FP&A"), as depicted in the figure below. (Lee Dep. 147; Deposition of Gerald W. Krohn ("Krohn Dep.") attached as **Exhibit 3** at 43-44, 73; Deposition of Mark Henefeld ("Henefeld Dep.") attached as **Exhibit 4** at 28-29).



The transactional[1] accounting team is responsible for accounts payable ("AP"), accounts receivable ("AR"), payroll, and the general ledger ("GL").  On the other hand, the FP&A team is responsible for performing economic analysis, forecasting and planning, and reporting financial and other information to Dover. (Lee Dep. 59, 147, 308; Krohn Dep. 73-74; Henefeld Dep. 28-29, 93-94).  FP&A work requires sophisticated strategic financial thinking, evidenced by the advanced degrees and training needed for successful leadership over such tasks.  (Krohn Dep. 71-76).  Transactional accounting, by contrast, is "forensic" in nature, and typically requires less sophisticated skill sets, qualifications and experience to perform.  (*Id*.; Declaration of Mark Henefeld ("Henefeld Decl.") attached as **Exhibit 5** at ¶ 1).

Employee roles within Belvac's Finance Department are divided between these two teams. (Lee Dep. 183, 184; Henefeld Dep. 28).  For example, the Senior Financial Analyst[2] and the Financial Analyst – Cost[3] are on the FP&A team.  (Lee Dep. 54, 65, 111, 308, 322; Exs. 89-91).  The AP Clerk, AR Specialist, and Payroll Administrator are on the transactional accounting team.  (*Id.*)  Each team has always had a clear chain of command. (Lee Dep. 62, 76, 91, 176-77, 186).  While their roles are very different, the two teams are interdependent: information gathered and managed by the transactional accounting team is necessary for the FP&A team's analysis and its development of projections, plans, and recommendations. (Lee Dep. 93-94, 332, 325; Henefeld Decl. ¶ 2; DiTomasso Dep. 71).

---

[1] Transactional duties were called "Controllership" in Mark Henefeld's experience. (Henefeld Dep. 28).
[2] Rob Garner occupied this role at all relevant times. (Lee Dep. 63-64; Henefeld Dep. 66-67; DiTomasso Dep. 134).
[3] Tony Maye occupied this role under Tammy Bateman (2010-11) (Lee Dep. 97) and then under Steve Mistretta (2011-12) (Lee Dep. 170-72). Cheryl Burgess has occupied it under DiTomasso (2013 to the present) (Lee Dep. 64, 119). This role is sometimes called "Senior Financial Analyst," "cost analyst," "Senior Cost Analyst," or "Inventory Analyst." (Lee Dep. 63-64; Henefeld Dep. 66-67; DiTomasso Dep. 134).

**B.     Belvac Finance Department Structure, 2010-15.**

Lee was hired on March 29, 2010 as Accounting Manager at an annual salary of $70,080. (Lee Dep. 46, 56; Ex. 1).  Lee supervised the three transactional accounting team members (AP Clerk, AR Clerk, and Payroll Administrator), which she would continue to do over her eight-year tenure at Belvac, regardless of her job title. (Lee Dep. 54-57, 66, 91, 105, 321-22).

Lee initially reported to Corporate Finance Manager ("CFM") Tammy Bateman, who reported directly to CFO Jerry Krohn. (Lee Dep. 54; Declaration of Donn Schnarr ("Schnarr Decl.") attached as **Exhibit 6** at ¶ 1).  As shown in the figure below, the CFM was responsible for **both** transactional accounting and FP&A.  (Lee Dep. 63-64, 111-12).



Bateman was promoted out of the CFM role in March 2011, and Lee then reported to Bateman's successor, Steve Mistretta. (Lee Dep. 77, 171; Ex. 38).  When Mistretta left in December 2012, Belvac changed the title of this role to "Controller" and hired Paul DiTomasso, as discussed in Section II.C., *infra*. (Lee Dep. 100-02; Krohn Dep. 21; DiTomasso Dep. 14-16).  But regardless of which individual was in the role or what title was used, Belvac had the same structure in place from 2010 to 2015:  one finance leadership role was responsible for both FP&A and transactional accounting, and reported directly to the CFO.  (Lee Dep. 62-65, 111-12, 321-22).

C.      **Belvac Selects DiTomasso for Mistretta's Vacancy.**

After Mistretta left in 2012, Belvac sought his replacement by posting, both internally and externally, a job opening for a "Controller" position. (Schnarr Decl. ¶ 4; Lee Dep. 101-02; Krohn Dep. 21; DiTomasso Dep. 15). The job description made clear that Belvac was looking for someone to take direct authority over FP&A, and also to supervise the transactional accounting function. (Deposition of Donn H. Schnarr ("Schnarr Dep.") attached as **Exhibit 7** at 30-31; Dep. Ex. 143).

Lee admits she did not have the experience or education required for the Controller position, and she did not apply for it. (Lee Dep. 101-04; 108; Krohn Dep. 71-73).  In fact, Lee briefly had tried to move into a Financial Analyst role (which she considered a promotion) the previous year.  (Lee Dep. 66-68, 76; Ex. 4).  The move was unsuccessful, however, and she remained on the transactional team in her Accounting Manager role. (*Id.*).

In 2013, DiTomasso applied for Controller[4] and he was hired on July 8, 2013. (DiTomasso Dep. 15; Krohn Dep. 37).  He was extremely qualified for this position – in fact, Lee and Krohn testified that he was "overqualified." (Lee Dep. 112; Ex. 18; Krohn Dep. 39).

1.      **DiTomasso's Education and Experience.**

DiTomasso earned his B.S. in Accounting from the University of Massachusetts at Dartmouth in December 1983. (DiTomasso Dep. 8).  He earned a Master of Business Administration ("MBA") from DeSales University in 1995. (*Id.*).  In 2004, he earned the Certified Management Accountant ("CMA") designation, which required hundreds of hours of study and completion of a 12-hour examination on financial reporting, internal controls, and

---

[4] DiTomasso wanted to return to the East Coast to be closer to his family. (DiTomasso Dep. 15, 51).

operations. (DiTomasso Dep. 10-12; Lee Dep. Ex. 18).  In 2005, he earned the Certified

Financial Manager ("CFM") designation, which required more study and completion of 3-hour

exam on debt financing and liquidity issues. (DiTomasso Dep. 10-12, 133; Lee Dep. Ex. 18).  He

then passed the Certified Public Accountant ("CPA") exam in 2011. (DiTomasso Dep. 12).  He

attends yearly continuing education to maintain his certifications. (DiTomasso Dep. 13).[5]

DiTomasso's FP&A work experience likewise was extensive. (Krohn Dep. 77-79).  In

1983, he began a career that progressed from Financial Analyst and Plant Accountant roles with

Spalding Sports Worldwide, to Accounting Manager with the Holland Company, then to

Assistant Controller of Global Operations for Pfizer Pharmaceuticals. (DiTomasso Dep. 8-10).

By 2013, DiTomasso was the Manager of FP&A for the Power Segment of Lufkin Industries,

where he received an annual salary of $180,000 with a $54,000 annual bonus plus stock options.

(DiTomasso Dep. 14-16).  By comparison, Lee's salary in 2012 as Belvac's Accounting

Manager was $76,000, and she does not claim she was underpaid as Accounting Manager. (Lee

Dep. 87; Ex. 4).

DiTomasso's entire career had been with international, publicly traded companies, and he

had been posted overseas in Turkey, Belgium, the UK, and Germany. (DiTomasso Dep. 8-10,

144; Lee Dep. Ex. 18). He had been responsible for financial planning, reporting and analysis for

Mineral Technologies' domestic and thirteen of its foreign locations. (Lee Dep. 110; Ex. 18).  He

had set up companies in Slovakia, France, Portugal, and Poland and had worked on joint

ventures in Finland, Indonesia, Japan, and Brazil. (DiTomasso Dep. 144).  He had extensive

---

[5] DiTomasso continued his education after he joined Belvac: in 2015, he earned both a Certificate in "Lean" from Villanova University, and a Six Sigma "Yellow Belt," a credential which signifies advanced education in "Lean" principles, from the America Society for Quality. (DiTomasso Dep. 13).

FP&A experience dealing with operations, internal controls, reporting, and financial

consolidations. (*Id.*). He was familiar with foreign transactions and exchange rates. (Krohn Dep.

78).  Belvac was looking for exactly DiTomasso's international FP&A experience in 2013.

(Krohn Dep. 78; DiTomasso Dep. 144).  Krohn, the decision-maker, recalled:

> He was in roles . . . , frankly, that you would see at the corporate
> level above us in our Segment, and he had filled those roles before,
> and that is why he was actually almost stepping back to come into
> the controller position. He was very qualified, in fact overly
> qualified for that job.

(Krohn Dep. 74-75).

## 2. Lee's Education and Experience, as Compared to DiTomasso's.

Lee did not have an educational, training or work experience background comparable to

DiTomasso. (Lee Dep. 108-13; Ex. 18; Krohn Dep. 77-79). She earned a bachelor's degree from

Clearwater Christian College ("CCC") in 1997. (Lee Dep. 24-27).  While at CCC, Lee worked as

an office assistant for Diamond Glass of Tampa Bay, which replaces broken automobile

windows. (Lee Dep. 33).  Lee also worked in collections for Cliff Weil, a vending company, and

as a customer service representative for Signet Bank's credit card unit. (Lee Dep. 34-35; 44; 50).

In 1997, Lee took an entry-level accounting position with S&K Menswear ("S&K") with a

$22,000 annual salary.  (Lee Dep. 36-38).  Lee ultimately progressed to Finance Manager with a

salary between $65,000 and $75,000 by 2008. (Lee Dep. 36-38, 41-50). While at S&K, Lee sat

for, but did not pass, the CPA exam. (Lee Dep. 26).  Between 2008 and 2010, Lee was a

Financial Systems Analyst—not a financial analyst—for Hamilton Beach where her ending

salary was $70,000. (Lee Dep. 41-43, 49-50; Ex. 1).

DiTomasso's advanced degrees and experience would have been desirable for a

candidate for the CFO position at Belvac. (Lee Dep. 120-21). By contrast, Lee did not have an

MBA, nor did she have CFA, CFM, or CPA designations at any time during her tenure at Belvac.[6] While, as discussed above, DiTomasso had directed financial planning, reporting, and analysis functions for many years, Lee had no comparable FP&A experience. (Lee Dep. 110, 147; Exs. 1, 18). Because the Belvac Controller role had direct responsibility for FP&A, such experience was critical. (DiTomasso Dep. 34; Krohn Dep. 73).

Manufacturing accounting is different than other types of accounting; DiTomasso had over 25 years of manufacturing experience when he applied to be Belvac's Controller. (Lee Dep. 118; Ex. 20). Lee had no manufacturing accounting experience prior to joining Belvac. (Lee Dep. 118; Ex. 20). Finally, DiTomasso had experience working for large international organizations that Lee did not. (Lee Dep. 110; Ex. 18).

Krohn summarized the distinctions between their education and experience:

> There is a lot of difference that would correspond with the different pay and a different position. . . .  When you get to just looking, for instance, education and certifications, you look at a Bachelor of Science in accounting and business administration for [Lee], and whereas for [DiTomasso], you've got his Bachelor's Degree in accounting, Master's Degree in business administration. He is a Certified Management Accountant, he is a Certified Financial Manager, and a Certified Public Accountant. The Certified Financial Manager shows a lot of analysis and such ability there, as well as both not just CPA but CMA, that is somebody that is going out there and getting a lot of background and a lot of training to do a lot . . . -- as opposed to nothing wrong with having a Bachelor's Degree only, but there is a significant difference between the two of them. . . . [DiTomasso] already . . . had global director of finance experience. . . . [H]e [was] manager of financial planning and analysis, and he had . . . served overseas himself in a controller position, so he had that international experience hands-on. He knew foreign transactions and exchange

---

[6] Lee did not pursue advanced degrees despite knowing that Belvac would reimburse her under its tuition reimbursement program. (Krohn Dep. 71-73; Lee Dep. 122-23). Kelly Smith got her Masters of Accounting entirely at Belvac's cost while Lee supervised her. (Deposition of Kelly A. Smith attached as **Exhibit 8** at 7, 26-27; Ex. 154; Lee Dep. 121-22).

> rates. There is a lot of difference. . . .  [DiTomasso] was dealing
> with manufacturing companies which is what we were looking for
> on a large scale, and he had an abundance of experience in that
> area that [Lee] didn't have.

(Krohn Dep. 77-79).

Lee's own expert stated that DiTomasso's education and experience were extensively

different from Lee's, and that Belvac could reasonably pay them differently on that basis, or on

the basis of focusing mainly on FP&A versus transactional tasks. (Deposition of Pamela

Schlosser ("Schlosser Dep."), attached hereto as **Exhibit 9** at 48-61). She also testified that

Belvac would have reason to pay them that differently because their positions were very different

functionally, they had worked in different size organizations, were required to have different

skills, performed different job functions, and had varying degrees of experience outside of

Dover. (Schlosser Dep. 83-84).

### D.    Belvac's Finance Department with DiTomasso as Controller (2013 to 2015).

DiTomasso agreed to starting annual salary of $145,000 and he began work under the

Controller title on July 8, 2013. (DiTomasso Dep. 87-91; Ex. 105).  DiTomasso' salary-plus-

bonus (he also had stock options) at his previous company had been $234,000, but he was

willing to take a steep pay cut to be closer to his extended family, who lived near Belvac's

headquarters. (DiTomasso Dep. 16).  Belvac's CFO, Jerry Krohn, agreed to this level of

compensation—which was above the top end of what he had wanted to pay—due to

DiTomasso's education, skills, and qualifications and because he believed DiTomasso could be a

potential successor upon his retirement. (Krohn Dep. 39, 74-77; DiTomasso Dep. 31, 96-97;

Schnarr Dep. 22; Lee Dep. 121, 130, 131). As another point of reference, Mistretta was earning

approximately $97,000 when he left in late 2012. (Deposition of Steve Mistretta attached as

**Exhibit 10** at 14; DiTomasso Dep. 87-91; Ex. 105; Krohn Dep. 21).

As noted above, the Belvac Finance Department structure remained the same during DiTomasso's tenure from 2013 to 2015 as it had previously. (Lee Dep. 171; Ex. 38). The Controller (formerly Corporate Financial Manager) role was still directly responsible for both FP&A and transactional accounting functions, and still had the Financial Analysts, Accounting Manager, and associated roles reporting into it. (Lee Dep. 77, 170-71, 321; Ex. 38). But the primary focus of the Controller role at this time was the FP&A work. (Lee Dep. 151).

> **E.   Belvac Restructures the Finance Department in 2015, Changing Lee's and DiTomasso's Titles (but Not Roles).**

When Krohn retired in 2015, Belvac hired Mark Henefeld as its new CFO. (Krohn Dep. 11, 22; Henefeld Dep. 10). Henefeld came to Belvac from United Technologies, and had excellent qualifications. (Henefeld Dep. 11-14). DiTomasso remained with Belvac, and was still considered a strong potential successor to Henefeld. (Henefeld Dep. 16).

In 2015, Henefeld decided to restructure the Belvac Finance Department to match his past experiences at large companies. (Henefeld Dep. 28; Lee Dep. 174). Henefeld's past finance departments traditionally segregated the FP&A and transactional accounting roles to report to separate leadership positions: FP&A functions directly reported to a position called "Director of FP&A," while the transactional accounting functions and roles directly reported to a position called "Controller." (Henefeld Dep. 28-29). In Henefeld's view, this reflected the fundamental differences between strategic FP&A work and the transactional accounting work upon which it relies. (Lee Dep. 93-94, 332, 325; Henefeld Decl. ¶ 3). Henefeld restructured the Belvac Finance Department starting in April 2015, as reflected below. [7] (Lee Dep. 174, 221; Exs. 33, 38).

---

[7] Absent from these images is Cheryl Burgess. She was placed in a different department's organizational chart but reported directly to DiTomasso on FP&A tasks at all relevant times, as Lee admits. (Lee Dep. 171-76, 186-87; Ex. 38).

Henefeld changed DiTomasso's title from "Controller" to "Director of Finance" in April 2015,

later adjusting it to "Director of FP&A." (Lee Dep. 153, 165).  As part of this restructuring,

Henefeld changed Lee's title from "Accounting Manager" to "Controller" in December 2015, as

discussed further below. (Lee Dep. 174, 221; Exs. 33, 38).  DiTomasso remained responsible for

the same FP&A employees and Lee remained responsible for the same transactional employees.

(DiTomasso Dep. 92; Lee Dep. 208; 321).



**F.     DiTomasso Briefly Leaves Belvac in September 2015.**

In September 2015, DiTomasso left Belvac to pursue a different opportunity.

(DiTomasso Dep. 48-49; Lee Dep. 132).  Henefeld moved to hire a person to fill the vacancy

created by DiTomasso's departure. (Lee Dep. 147-49, 157-58; Ex. 34; Schnarr Dep. 82).  Lee

knew Henefeld was seeking a replacement for the FP&A position as early as October 2015, but

once again, she did not apply for the vacant job. (Lee Dep. 147-51; Ex. 31).

Henefeld directly assumed FP&A responsibilities until DiTomasso's position could be

filled. (Henefeld Decl. ¶ 4; Lee Dep. 347).  As it turned out, DiTomasso returned to his previous

Director of FP&A role in January 2016—he was gone for roughly one financial quarter. (Lee

Dep. 156, 306; Ex. 33; DiTomasso Dep. 56).  He returned to the FP&A leadership role at the

same pay and responsibilities as when he left. (Lee Dep. 162-65; Exs. 33; 35; DiTomasso Dep.

87).

> ### G.   Belvac Changes Lee's Title to Controller in December 2015.

Belvac did not "promote" Lee to Controller in December 2015 to fill the role briefly

vacated by DiTomasso. (Henefeld Decl. ¶ 5). Rather, the change in Lee's title from "Accounting

Manager" to "Controller" was part of Henefeld's planned restructuring.  (Henefeld Dep. 18).

HR's tactful announcement of the reorganization on the following page confirms this. (Henefeld

Dep. 77-78; Ex. 132).



Henefeld's communication with Belvac's head of HR (Donn Schnarr) on this topic also notes that the reorganization resulted in a change in title only for Lee (Henefeld Dep. Ex. 126):

> From: Henefeld, Mark
> Sent: Thursday, December 17, 2015 10:51 AM
> To: Schnarr, Donn <donns@belvac.com>
> Subject: Shelly Lee Title Change
>
> Donn,
> We discussed some time ago about changing Shelly's title (not salary but title only), but I never followed up with you to get it actually changed officially. Can you have Kristi provide the form and I can make the change and sign it so it's official?  With the new bands you created does this fit in her existing band or does that need to change as well?  Again, so salary change is needed at this time.
>
> Thanks,
>
> Mark Henefeld
> Chief Financial Officer
> Belvac Production Machinery, Inc.
> A Dover Company

Consistent with this, Belvac did not post the "Controller" position internally, as was its custom to do with higher level position openings. (Lee Dep. 100-01, 335-36; Schnarr Decl. ¶ 3).

From December 2015 to May 2018, Lee continued as Controller to oversee the same three transactional direct reports—accounts payable, accounts receivable, and payroll—she had overseen as Accounting Manager during the previous five years. (Lee Dep. 142-43).  Regardless of what title she had, Lee never had responsibility for the FP&A analyst roles, directly or indirectly, at any point during her career at Belvac, neither before the reorganization nor after. (Lee Dep. 62-65, 171, 183, 321-22).  DiTomasso continued to oversee the FP&A analyst roles and perform the same FP&A tasks and responsibilities he had between 2013 and 2015, when he was called "Controller." (Lee Dep. 321; DiTomasso Dep. 92).

**H.      DiTomasso's Controller Role Differed Significantly from Lee's in the Level of FP&A Responsibility.**

There is no genuine dispute over the critical fact that Lee did not perform the same FP&A tasks while she was called Controller that DiTomasso performed when he was in the Controller role. While Lee claims that she took on *some* (not all) FP&A tasks, she also does not know the extent of DiTomasso's FP&A duties when he was Controller. (Lee Dep. 147) (e.g.: Lee Dep 339

(*flash summary template*), 343 (*profit and inventory calculation*); 349 (*monthly meeting in Rick Steigerwald's office to review Belvac's financial results with Dover*).

Over and over in her deposition, Lee claimed to have "involvement" in certain FP&A tasks (at the same time that DiTomasso was called "Director of FP&A") but, when pressed, she admitted that they were not her responsibility or that the FP&A team did them. (Lee Dep. 194, 199, 216, 308-13, 315-18, 320, 323-24, 329-31, 337-38, 345).  This is consistent with Henefeld's testimony that there was very little overlap between Lee and DiTomasso's roles—he described it as "less than 5%." (Henefeld Dep. 18, 31, 102). Consider, for instance, this passage from Lee's deposition:

> Q.  You never did the tax report in monthly or annual?
> A.  We prepared –
> Q.  You prepared information that went into it, but Rob Garner [Senior FP&A Analyst, who directly reported to DiTomasso] was responsible?
> A.  Correct; he would upload it to Dover who prepared the final tax package.
> Q.  And you never did the R&D tax credit report?
> A.  I was involved with reviewing that with Rob.
> Q.  Well, I'm not talking about being involved.
> A.  But not -- no, I didn't do it. He did the R&D, yes.
> Q.  And you were not responsible for inventory accounting, correct?
> A.  No.
> Q.  That was Cheryl Burgess?
> A.  That was Cheryl Burgess [Senior FP&A Analyst, who directly reported to DiTomasso].
> Q.  And you never did any insurance renewal reporting?
> A.  No.
> Q.  And you never did any work in connection with customer requests for insurance or insurance certificates?
> A.  Yes; I dealt directly with Rob [Garner], and we would coordinate with whoever our provider was.
> Q.  But that wasn't your responsibility?
> A.  No, it was Rob's.

(Lee Dep. 328-30).

It is undisputed that the Controller role had these responsibilities when DiTomasso was in it, and that the Controller was ***not*** responsible for them when Lee was in the role:

1. Direct oversight of Rob Garner's performance of his duties. (Lee Dep. 177, 306; DiTomasso Dep. 142).
2. Direct oversight of Cheryl Burgess' performance of FP&A-related duties. (Lee Dep. 173; DiTomasso Dep. 134).
3. Direct oversight of the duties of the Accounting Manager. (Lee Dep. 321; DiTomasso Dep. 134).
4. Indirect oversight of payroll specialist, accounts receivable specialist, accounts payable specialist. (Lee Dep. 55, 321; DiTomasso Dep. 31).
5. Implementation of Belvac's financing statements. (DiTomasso Dep. 137).
6. Consolidation and loading into the Dover financial system, Khalix, via D-Plan. (Lee Dep. 305 – 306; DiTomasso Dep. 23).
7. Calculating property and inventory. (DiTomasso Dep. 137; Lee Dep 328-30).
8. Generating financial statements, profit and loss, balance sheet, and cash flow. (DiTomasso Dep. 147; Lee Dep. 329).
9. Monthly review, with DiTomasso, of financial statements prior to close for business and accounting analysis. (DiTomasso Dep. 138; Lee Dep. 349).
10. Capital expenditures. (Lee Dep. 311).
11. Preparation of the tax package. (Lee Dep. 313; DiTomasso Dep. 139).
12. Preparation of the income, property and sales components of the tax package. (Lee Dep. 313; DiTomasso Dep. 139).
13. Setting up cost accounting, labor rates, overhead rates. (Lee Dep. 316; DiTomasso Dep. 138).
14. Mapping for Khalix. (Lee Dep. 318).
15. Running management calculations such as ratios, margins, working capital as a percentage of sales, bookings, and backlog. (Lee Dep. 323; DiTomasso Dep. 139).
16. Detailed financial metrics forecasting reported to Dover. (Lee Dep. 323; DiTomasso Dep. 33).
17. Reporting the monthly financial results from Belvac closing to Dover. (Lee Dep. 324-25; DiTomasso Dep. 138, 141).
18. After consolidation is completed, uploading of trial balance amounts for all Belvac offices into Khalix, then input of profit and inventory and other supplemental amounts. (Lee Dep. 342; DiTomasso Dep. 137, 139).
19. Oversight of fixed assets and capital assets. (Lee Dep. 326; DiTomasso Dep. 141).
20. Completion of Dover-required income statement and balance sheet analysis of unusual amounts and period to period comparisons. (Lee Dep. 342).
21. Monthly completion of the consolidation process, verification that all Khalix input is accurate and complete, and notification to Dover that the monthly process was complete. (Lee Dep. 343; DiTomasso Dep. 137).
22. Consolidation of financial results for all Belvac offices. (Lee Dep. 323; DiTomasso Dep. 139).

23. Profit and inventory calculation for all Belvac offices. (Lee Dep. 343; DiTomasso Dep. 137, 139).

24. Inputting actual sales results in flash summary or participation in the review of actual versus projected results to ensure accuracy of the results and discussion of required financial adjustments. (Lee Dep. 343).

25. Knowledge of how the profit and inventory adjustment amount is determined. (Lee Dep. 343; DiTomasso Dep. 142).

26. Announcement of Workday 2 financial projection to Dover with commentary, including bookings, revenue, earnings potential and commentary. (Lee Dep. 326; DiTomasso Dep. 141).

27. Uploading forecasting such as financial projections, profit and loss, balance sheet and cash flow into Khalix. (Lee Dep. 328; DiTomasso 142).

28. Uploading financial accounts with monthly account balances indicated. (Lee Dep. 344).

29. Input and analysis of all amounts entered in the monthly D-Plan projection template. (Lee Dep. 333-44).

30. Transfer of pricing study. (Lee Dep. 328).

31. Completion and reconcilement of quarterly Dover tax template. (Lee Dep. 345; DiTomasso Dep. 139).

32. Accruing E&O every month. (Lee Dep. 345).

33. Supplying correct margin percentage to use for the forecast model. (Lee Dep. 346; DiTomasso Dep. 139).

34. Approval of journal entries. (Lee Dep. 347; DiTomasso Dep. 140).

35. Involvement in the costing side of closing other than ensuring correct profit reporting and low margins. (Lee Dep. 337; DiTomasso Dep. 138).

36. Critical pre-Khalix loading tasks after manual adjusting of journal entries. (Lee Dep. 338; DiTomasso Dep. 140).

37. LCM adjustments. (Lee Dep. 349).

38. Calculation of the inventories section of the closing process. (Lee Dep. 337; DiTomasso Dep. 137).

39. Signing off on the variance package. (DiTomasso Dep. 139-40; Lee Dep. 331, 347, 348).

40. Approval of manufacturing variance package. (DiTomasso Dep. 139 – 140; Lee Dep. 331, 347, 348).

41. Attendance at the monthly manufacturing variance meeting. (DiTomasso Dep. 139-40; Lee Dep. 331, 347, 348).

42. Overall variance reporting. (DiTomasso Dep. 139-40; Lee Dep. 331, 347, 348).

43. Monthly variance analysis. (DiTomasso Dep. 139-40; Lee Dep. 331, 347, 348).

44. Signing off on the variance analysis. (DiTomasso Dep. 139-40; Lee Dep. 331, 347, 348).

45. Preparation of annual and monthly tax reports. (Lee Dep. 328; DiTomasso Dep. 139).

46. Reporting sales margin actuals and forecasts to Dover. (Lee Dep. 349; DiTomasso Dep. 139).

47. Approval of wire transfers. (Lee Dep. 348).

48.   Monthly review of financial results with Dover in Belvac President Rick Steigerwald's office. (Lee Dep. 349; DiTomasso Dep. 141).

49.   Involvement in cost roles. (Lee Dep. 349; DiTomasso Dep. 139).

50.   Flash summary template comparing the actual monthly results to the projection for the month. (Lee Dep. 340).

51.   Adjustments to the monthly income statement for profit and inventory. (Lee Dep. 339; DiTomasso Dep. 139, 142).

52.   Eliminations of intercompany and related costs amounts from the consolidated income statement. (Lee Dep. 339).

53.   Post-adjustment consolidation for individual results of all Belvac offices into the total consolidated income statement. (Lee Dep. 338-39: DiTomasso 138).

54.   Generation of the President's Letter, the monthly schedule and related commentary, including the required financial chart. (Lee Dep. 327; DiTomasso Dep. 141).

55.   Calculation of the prepaid costs aspect of closing. (Lee Dep. 338; DiTomasso Dep. 138).

56.   Monthly Dover business financial review call with segment leadership. (Lee Dep. 326; DiTomasso Dep. 141).

57.   Preparation of the majority of the slide deck for the Monthly Dover business financial review call with Segment leadership. (Lee Dep. 326-27).

58.   Production of official consolidated financial results. (Lee Dep. 325).

59.   Inventory analysis for international facilities. (Lee Dep. 320; DiTomasso Dep. 137).

60.   Monthly forecast of profitability sent to Dover. (Lee Dep. 322; DiTomasso Dep. 142).

61.   Attendance at sales meetings. (Lee Dep. 310, 314; DiTomasso Dep. 142).

62.   Inventory accounting. (Lee Dep. 329; DiTomasso Dep. 137).

63.   Manual process of preparing monthly department expense budgets other than the Accounting Department. (Lee Dep. 330; DiTomasso Dep. 139).

64.   Attendance at the annual sales review process. (Lee Dep. 330; DiTomasso Dep. 142).

65.   Preparation of the annual sales plan. (Lee Dep. 330-31).

66.   Involvement in setting or establishing overhead rates. (Lee Dep. 331; DiTomasso Dep. 138).

67.   Setting the material burden. (Lee Dep. 331).

68.   Responsibility for customer requests for insurance or insurance certificates. (Lee Dep. 330-31).

69.   Insurance renewal reporting. (Lee Dep. 329).

70.   R&D tax credit report. (Lee Dep. 329; DiTomasso Dep. 139).

71.   Scrap reporting. (Lee Dep. 332).

72.   Efficiency reporting. (Lee Dep. 332).

73.   Consultation with CFO in connection with mergers and acquisitions. (Lee Dep. 317).

74.   Budgeting for approximately 73 Belvac departments other than the Finance and Admin. Departments. (Lee Dep. 312; DiTomasso Dep. 139).

75.  Inventory depreciation. (Lee Dep. 311; DiTomasso Dep. 137).

76.  Shop order reporting. (Lee Dep. 331).

77.  Part cost quotes for new or existing parts. (Lee Dep. 332; DiTomasso Dep. 138).

78.  Interaction or involvement with Segment CFO or President. (Lee Dep. 332; DiTomasso Dep. 123-24).

79.  Monthly calls with the Segment CFO and President. (Lee Dep. 333; DiTomasso Dep. 138).

80.  Labor reporting, setting up overhead rates and labor rates, earned hours direct labor report. (Lee Dep. 328, 332; DiTomasso Dep. 138).

81.  Calculation of excess and absolute inventory reporting. (Lee Dep. 332; DiTomasso Dep. 137).

82.  Ledger strategic plan. (DiTomasso Dep. 138).

83.  Forecasting process. (DiTomasso Dep. 138).

84.  Quarterly analysis with Dover loading Khalix and the operating bridges. (DiTomasso Dep. 138).

85.  Cost accounting. (DiTomasso Dep. 138; Lee Dep. 186, 316).

86.  Tax planning. (DiTomasso Dep. 139; Lee Dep. 312-13).

87.  R&D calculation. (DiTomasso Dep. 139; Lee Dep. 329).

88.  More than a limited involvement in the budget process. (DiTomasso Dep. 139; Lee Dep. 192, 308).

89.  Oversight of the consolidation of the budget process. (DiTomasso Dep. 139; Lee Dep. 191).

90.  Oversight of the creation of financial statements. (DiTomasso Dep. 139).

91.  Manual preparation of "Departmentals." (DiTomasso Dep. 139).

92.  Discussion of pricing proposals with VP of sales. (DiTomasso Dep. 140; Lee Dep. 310).

93.  Weekly sales discussions due to the need to re-forecast every month and every quarter and the need to estimate, in conjunction with the sales group, sales and profit performance. (DiTomasso Dep. 140; Lee Dep. 310).

94.  Monthly and annual sales meetings, and impromptu sales discussions due to the need to re-forecast every month and every quarter and the need to estimate, in conjunction with the sales group, sales and profit performance. (DiTomasso Dep. 140; Lee Dep. 310).

95.  Approval of manual accounting entries. (DiTomasso Dep. 140; Lee Dep. 347).

96.  Overall flux analysis with Dover, which involves asking for changes in Belvac's balance sheet and operating statements from quarter to quarter. (DiTomasso Dep. 141).

97.  Khalix loading. (DiTomasso Dep. 142; Lee Dep. 342).

98.  Confirmation of Khalix reporting. (DiTomasso Dep. 142; Lee Dep. 342-43).

99.  Annual strategy meetings with the Dover executive team and key functional people with responsibility for executive the strategies, including the sales group and heads of business in Europe and Asia and other locations. (DiTomasso Dep. 143; Lee Dep. 310).

Lee noted several times in her deposition that she and DiTomasso had the same written job description as Controller. (Lee Dep. 195, 207; DiTomasso Dep. Ex. 99). Belvac had created a written job description that it posted for Mistretta's replacement, as part of the decision to change the title of Mistretta's former role from Corporate Finance Manager to Controller.  (Schnarr Dep. 31; Ex. 143; Decl ¶ 4).  DiTomasso testified he never asked for and could not recall ever seeing the written job description for his role as Controller. (DiTomasso Dep. 34, 41).

Regardless, the written description Lee references did not accurately reflect DiTomasso's role; he had many more responsibilities as Controller than are listed on that document. (DiTomasso Dep. 33-42; Ex. 99).  He testified that numerous critical tasks for which he was responsible as Controller, which Lee did not perform, are not listed in the description, including: financial reporting, consolidation, operational accounting, building the strategic plan, budgets, reporting to the Segment and Dover, and quality reporting with Dover. (DiTomasso Dep. 34). For another example, DiTomasso's responsibility for overseeing several direct reports other than Lee was not reflected on the description. (DiTomasso Dep. 39; Ex. 99).

## I.      Belvac Repeatedly Confirmed Lee's Compensation Was Appropriate.

In February 2017, Lee complained to Henefeld about her pay being too low. (Lee Compl. ¶¶ 16, 17; Henefeld Decl. ¶ 22; Dep. 86).  At that time, she had received regular pay raises that were either in line with (and sometimes well above) the company's average.  (Lee. Dep. 87, 209; Exs. 4, 72).  She received significant bonuses and two "President's Awards"—monetary awards of $16,350 in April 2015 and $25,200 in March 2016—and would receive another $12,000 in April 2017, and $12,500 *just a month before she resigned*. (Lee. Dep. 230; Ex. 72).

In response to her concern, Henefeld commissioned a wage study in order to assess whether Lee's pay was at the same level as other positions in the local geographic area that performed the same tasks as she did. Henefeld recalls that:

> She never compared herself to Paul that I recall. She just complained that she thought – she wanted more money. And so I met with her four or five different times. Always met with her— never shut my door other than the final day when she left, and there was a specific reason for that. Had multiple discussions with her and then did a specific pay study called the Mercer study, which was a third-party independent company that Dover uses to help allocate what job duties to pay for particular duties across the board. Kind of averages it. It is a mean, it has a high end and a low end. I performed that study for her, I had a third-party review it, and I reviewed that with her. Showed that the pay was in line with her duties and her role.

(Henefeld Dep. 85-86).

As noted above, Henefeld confirmed that Lee's duties more closely matched Mercer's description of an "Accounting Manager" role than its description of a "Controller" role. (Henefeld Decl. ¶ 22; Dep. 86; Lee Dep. 376).  This is unsurprising, given that the "Controller" job can be defined in very different ways from company to company, based on their size and sophistication.  (Krohn Dep. 9-10).

In November 2017, Lee complained about her pay in an email exchange with Henefeld and DiTomasso. (Lee Dep. Ex. 45).  In this same exchange, Lee refused to take responsibility for a lease accounting task that she now claims was one of the duties she took on as Controller. (Lee Compl. ¶ 29; Dep. Ex. 45).  Lee told Henefeld that DiTomasso's financial analyst direct reports should perform the task, and not her team (whom she described as "clerical employees"). (Lee Dep. Ex. 45).  Lee complained she did not have an office and was underpaid, noting that Paul DiTomasso had made approximately $46,000 more per year when he was Controller. (Lee

Compl. ¶¶ 16,  17).  Henefeld reiterated his conclusion that she was fairly compensated. (Lee

Dep. Ex. 45).

Unsatisfied, Lee filed a complaint with Dover's "Human Resources Hotline" that her pay

was too low and again, her complaint was thoroughly investigated and determined to be

unfounded – this time, by several HR representatives outside of Belvac, including the Segment

HR lead. (Deposition of Amanda Brooks ("A. Brooks Dep.") attached as **Exhibit 11** at 18; Ex.

138).  In fact, the subsequent investigators found she actually was overcompensated for the work

she was performing. (A. Brooks Dep. 22-23; Ex. 138).

**J.      Lee Faced No Retaliation from Belvac.**

Lee makes a number of allegations that she faced retaliation throughout her eight-year

tenure at Belvac. She claims Belvac first retaliated against her as the result of an event during

Mistretta's tenure as CFM. (Lee Compl. ¶ 14).  Her claim relates to a January 2012 meeting

(over six years prior to her resignation) where Schnarr, Mistretta, and Lee discussed Lee's access

to payroll information for other employees and concerns about Lee using that information to

complain about her own bonus percentage. (Lee Dep. 78-81; Ex. 12).  Lee acknowledged that

Schnarr assured her during this meeting that she should not fear retaliation, and could come to

him, Krohn, or even Belvac President Rick Steigerwald with any concerns. (Lee Dep. 84, 86-87).

Lee lost no pay, was not disciplined, and suffered no adverse treatment. (Lee Dep. 88).

Lee also claims she faced "subtle retaliation" when she found an anonymously marked up

copy of a page from Belvac's Dress Code in her company inbox in September 2015 (more than

two years prior to her resignation). (Lee. Dep. 143).  Lee viewed the incident as harassment and

claimed she feared for her safety, so Belvac offered her an escort to and from her car.  (Lee Dep.

143; Ex. 29; Schnarr Dep. 65-66).  Lee agreed that no adverse action followed. (Lee Dep. 145).

Contrary to any suggestion of retaliation, and as discussed above, after Henefeld had investigated her claim of low pay in April 2017, Lee was given a 7.5% pay increase, which was backdated to January 1, 2017. (Lee Dep. 376, 209; Ex. 4). In less than sixteen months, from December 2015 to April 1, 2017, Lee's pay was increased nearly $10,000 and she was given almost $40,000 in bonuses. (Lee Dep. Ex. 3).

When Lee complained in November 2017 about her pay, just months after Henefeld had investigated the issue in April, Henefeld expressed frustration but took no adverse action against her. (Henefeld Dep. 90, 96).[8]  In December of 2017, Lee remained unsatisfied with Belvac's conclusion that her compensation was appropriate, and filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") that alleged gender-based pay discrimination – but not retaliation. (Lee Compl. ¶ 35; Dep. Exs. 66, 67). When Schnarr received a copy of the charge, he reminded Henefeld, her direct supervisor, that Lee should be treated no differently as a result of the filing. (Schnarr Dep. 57).

Around that same time, Lee attended her first of thirteen marital counseling sessions stemming from her husband's discovery that she was in the midst of a five-year affair with a Belvac co-worker. (Lee Dep. 271; Ex. 75; Deposition of Teresa Billingsley ("Billingsley Dep."), attached hereto as **Exhibit 12** at 13; Ex. 154).  By March 2018, Lee's husband requested that she quit her job at Belvac as a result of her affair with her co-worker and she began looking for a different job. (Billingsley Dep. 15-18; Ex. 154). Soon thereafter, Lee applied to two other companies while still at working at Belvac, and just days after she resigned she started her new

---

[8] Henefeld was out on vacation in November and, by the time he returned, Lee had filed her Hotline Complaint, then her EEOC Charge, and then gone out on medical leave and started acting aggressively towards him; Henefeld did not want to meet with her without a witness during this time given the pending investigations. (Henefeld Dep. 90, 96).

job as "Corporate Controller" at a building supply store in Moneta, Virginia earning $75,000 per year. (Lee Dep. 265-66, 283).

## III.      ARGUMENTS AND AUTHORITIES

### A.      Standard of Review.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 248.  Moreover, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250.

In considering a Rule 56 motion, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003), *cert. denied*, 541 U.S. 1042 (2004).  The court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims . . . from proceeding to trial."  *Id.* at 526.

**B.      This Court Should Grant Summary Judgment on Lee's Title VII and EPA Discrimination Claims.**

Lee claims the disparity between her compensation and DiTomasso's when each served as Controller violates both the EPA and Title VII.  The EPA forbids employers from:

> Discriminat[ing] . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1); *see Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019).

To prevail on her EPA claim, Lee must make a prima facie showing of three elements: (1) Belvac paid higher wages to an employee of the opposite sex who (2) performed equal work on jobs requiring equal skill, effort, and responsibility (3) under similar working conditions.  *See Spencer*, 919 F.3d at 203; *EEOC v. Maryland Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)).

If Lee were able to establish a prima facie case, the burden then would shift to Belvac to show the pay disparity resulted from an EPA exception: (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quality or quantity of production; or (4) a differential based on any factor other than sex.  29 U.S.C. § 206(d)(1).  Were Belvac to make this showing, the burden would fall on Lee to "rebut the defendant's evidence." *Strag v. Bd. of Trustees, Craven Cmty. Coll.*, 55 F.3d 943, 948 (4th Cir. 1995).

"Title VII, in contrast to the [EPA], requires establishing intentional discrimination." *Spencer*, 919 F.3d at 207.  Where, as here, there is no direct evidence of discriminatory intent,

the plaintiff may use the *McDonnell-Douglas* burden shifting framework. *Id.* at *13. To establish a prima facie case of pay disparity Lee must establish

> (1) she is a member of a protected class, (2) she was performing her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive. . . . Where, as here, the prima facie case is based on comparators, the plaintiff must show that she is paid less than men in similar jobs. . . . While there is no bright-line rule for what makes two jobs "similar" under Title VII, courts consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications – provided the employer considered these latter factors in making the personnel decision."

*Spencer*, 919 F.3d at 203.

There is no genuine issue of material fact that Lee's Belvac Controller job was not "similar," much less "equal," to DiTomasso's Belvac Controller job as required to establish a violation under Title VII and the EPA, respectively. Moreover "factors other than sex" resulted in the pay differential, which forecloses each of Lee's claims as a matter of law.

### 1.      Lee Cannot Satisfy a Prima Facie Case Under EPA Because the Comparative Jobs are Neither Equal nor Similar.

Lee fails as a matter of law to establish that Belvac paid her "different wages . . . for equal work in [a job] which require[d] equal skill, effort and responsibility and which [was] performed under similar working conditions." *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994); *see Spencer*, 919 F.3d at 203-04 (same). Two jobs are not equal "if the more highly paid job involves additional tasks which (1) require extra effort, (2) consume a significant amount of the time and (3) are of an economic value commensurate with the pay differential." *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 333 (4th Cir. 2004), *cert. denied,* 544 U.S. 1032 (2005).

> Equality under the Act is a demanding threshold requirement. It requires a comparator to have performed work "virtually identical" (or the apparent synonym, "substantially equal") to the plaintiff's in skill effort and responsibility. *Wheatley,* 390 F.3d at 332-33. Similarity of work is not enough; the Act explicitly distinguishes between the work itself (which must be "equal") and the conditions of work (which need only be "similar"). 29 U.S.C. § 206(d)(1). The Act does not provide courts with a way of evaluating whether distinct work might have "comparable" value to the work the plaintiff performed. *See Wheatley, 390 F.3d at 333; see also Sims-Fingers v. City of Indianapolis,* 493 F.3d 768, 771 (7th Cir. 2007) (Posner, J.) (explaining that, when trying to identify "comparable" pay for unequal work, there are "no good answers that are within the competence of judges to give"). Instead, the Act's inference of discrimination may arise only when the comparator's work is equal to the plaintiff's

*Spencer*, 919 F.3d at 203-04; *see also Wheatley*, 390 F.3d at 333 ("[T]he jobs involved should be virtually identical").

Lee's Controller job and DiTomasso's Controller were not the same and they were not similar; rather, they were strikingly different. DiTomasso's FP&A responsibilities—which Lee never had—have an economic value commensurate with the pay differential, and not only Belvac thought so: DiTomasso earned $234,000 doing FP&A work in 2012 in Dallas, taking a pay cut to move to the more remote Lynchburg market in 2013. Lee's tasks as Controller from 2015 to 2018 overlapped with DiTomasso's from 2013 to 2015 less than five percent. (Henefeld Dep. 102). An overlap of 40% was held insufficient for a *prima facie* EPA showing in the Fourth Circuit. *Kling v. Montgomery Cnty., Maryland*, 324 F. Supp. 3d 582, 591 (D. Md. 2018), *aff'd*, 774 Fed. Appx. 791 (4th Cir. 2019).[9]

At bottom, Lee's Title EPA and Title VII discrimination claims rest on two immaterial facts: (a) she and DiTomasso both had the same job title, "Controller," albeit at different times;

---

[9] Kling's Title VII claim on the same facts as her EPA claim was dismissed under Fed. R. Civ. P. 12(b)(6).

and (b) the position description for the Controller position never changed.  *See Gustin v. W. Virginia Univ.*, 63 F. App'x 695, 698 (4th Cir. 2003) ("[J]ob titles are not dispositive."); *EEOC v. Central Kan. Med. Ctr.,* 705 F.2d 1270, 1273 (10th Cir. 1983) (explaining that job descriptions and job titles are not dispositive and that "[a]ctual job requirements are controlling").

"It is insufficient that Plaintiff and other male [employees] have similar titles and similar generalized responsibilities; the skills, effort and responsibility must be substantially equal." *Noel-Batiste v. Virginia State Univ.*, 2013 WL 499342, at *6 (E.D. Va. 2013); *see EEOC v. Port Auth. of N.Y. & N.J,* 768 F.3d 247, 256-58 (2d Cir. 2014) (explaining that "successful EPA claim depends on a comparison of actual job content; broad generalizations drawn from job titles, classification, or divisions, and conclusory allegations of sex discrimination, cannot suffice"). The Fourth Circuit has observed that "the EPA demands more than a comparison of job functions from a bird's eye view."  *Wheatley*, 390 F.3d at 333; *see also Spencer*, 919 F.3d at 204 ("[A] plaintiff may not rely on broad generalizations at a high level of abstraction.").

Lee "must present evidence on which a jury could rely to decide that she [and DiTomasso] had *equal* jobs, not just that they . . . performed vaguely related tasks using nominally comparable skills."  *Spencer*, 919 F.3d at 205; *see also Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) (focus should be on "the primary duties of each job, not duties that are incidental or insubstantial").

As in *Wheatley*, "[h]ere, we have employees whose jobs demand[ed] the performance of quite different functions."  *Id.* Viewing the facts in a light most favorable to Lee, there can be no denying the enormous scope of different work performed by DiTomasso and Lee when each held the Controller title.  Lee acknowledges this when she admits she did not previously handle FP&A functions "up until I became controller, and then I took on *some* of the financial reporting

and analysis." (Lee Dep. 147:14-15) (emphasis added). *See also Lewis v.Oklahoma*, 42 F. App'x 160, 172 (10th Cir. 2002) (performing "some functions" of another position insufficient to show jobs are substantially equal); *Ferroni v. Teamsters*, 297 F.3d 1146, 1149 (10th Cir. 2002) ("[I]t is not sufficient that some aspects of the two jobs were the same.").

The best illustration of the distinction between DiTomasso's role as Controller and Lee's later role as Controller is their completely different chains of command. As noted previously, the financial analysts performing FP&A functions reported directly to DiTomasso when he was Controller (and thereafter), but never at any time to Lee when she was Controller. On the other hand, the AP, AR, and payroll clerks performing transactional accounting functions reported directly to Lee when she was Controller, but never at any time to DiTomasso when he was Controller (or thereafter). Couple these inescapable facts with the 99 distinct admissions as to their different job functions described above, and it is indisputable that the two Controller roles were completely different when Lee and DiTomasso held that title. These facts are fatal to Lee's EPA claim (and also to her Title VII claim discussed below).

The sequence and circumstances of the job title changes likewise show the futility of Lee's claim. In 2013, DiTomasso was hired as Controller, a position posted internally and externally for which Lee was not qualified and did not pursue. (Lee Dep. 101-04; 108; Krohn Dep. 21, 71-73; DiTomasso Dep. 15; Schnarr Decl. ¶ 2). DiTomasso's job title was changed to "Director of Finance" in April of 2015, but he continued performing the same job duties.[10] (DiTomasso Dep. 92; Ex. 105; Henefeld Dep. 33-34; Ex. 121; Lee Dep. 159; Ex. 30). The "Director of Finance" title was not posted because it was not a new, open position; rather, it was

---

[10] It is clear that DiTomasso's role before and after this April 2015 title change was the same from Lee's perspective because she and Garner kept reporting to him as their supervisor before and after. (Lee Dep. 131, 221;306-07).

simply a title change, and at that point, there was no "Controller" position in the prior sense. (Schnarr Dep. 81; DiTomasso Dep. Ex. 105). Paul DiTomasso left the Company briefly, and after his departure, "Paul's role" was posted as "Manager of FP&A." (Schnarr Dep. 82; Ex. 34; Henefeld Dep. 34; Ex. 121; Lee Dep. 142; Ex. 28). "Paul's role" was the same he had performed both as Controller and Director of Finance. (Henefeld Dep. 34; Ex. 121; DiTomasso Dep. 57). Lee again did not even apply for the position. (Lee Dep. 149; Ex. 28). At the beginning of 2016, Paul DiTomasso returned to "Paul's role" as "Director of FP&A" at the same rate of pay, while Lee's title was changed to "Controller" at the same rate of pay. (Lee Dep. 162-65; Exs. 33; 35; DiTomasso Dep. 84). DiTomasso's role was not a newly created role—it was the same one he left in September. (Henefeld Dep. 44-46; Ex. 125). Lee's discrimination claims collapse under the weight of this inarguable evidence and begs the question: if Lee were performing the same or even similar functions as DiTomasso when he was "Controller," why was DiTomasso re-hired at all? Even if you accept Lee's premise—that despite the fact that Belvac re-hired DiTomasso, a highly trained, experienced, and expensive financial leader who performs strategic FP&A-level work, and *whose very title is "Director of FP&A,"* it for some reason decided instead to ask Lee to perform that very same work—Lee still admits (as she must) that she only performed *some* of those FP&A functions. This admission alone is enough to doom her pay claims under both Title VII and the EPA.

At bottom, this case is very similar to the Fourth Circuit's recent decision in *Spencer*, where the Court decided that "[t]he attempted comparison ultimately relies on the common title of "professor" plus some generalized responsibilities (*e.g.,* teaching students). Yet we have rejected an analogous claim that jobs with the same title and only vaguely corresponding responsibilities can be considered equal. *Spencer*, 919 F.3d at 204.

Lee's claim invites the Court to conclude that a controller is a controller is a controller. The Court should, and must, reject this invitation.  *See Port Auth. of N.Y. & N.J.*, 768 F.3d at 256-58 (rejecting argument that presumed attorney jobs all comparable – that "an attorney is an attorney is an attorney"); *Stopka v. Alliance of Am. Insurers,* 141 F.3d 681, 685-86 (7th Cir. 1998) (plaintiff's vice president position was substantially different from job performed by other vice presidents, which required skills plaintiff did not possess).

> ### 2. Lee Cannot Establish a Prima Facie Case Under Title VII Because Lee and DiTomasso Did Not Have "Comparable Experience, Education, and other Qualifications."

The standard for establishing a Title VII claim is the slightly more relaxed "similarity" requirement, which the Fourth Circuit has articulated as follows:

> Where, as here, the prima facie case is based on comparators, the plaintiff must show that she is paid less than men in similar jobs. . . .  While there is no bright-line rule for what makes two jobs "similar" under Title VII, courts consider whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications – provided the employer considered these latter factors in making the personnel decision.

*Spencer*, 919 F.3d at 207 (internal quotations omitted).

Lee and DiTomasso did not have "comparable experience, education, and other qualifications" required to satisfy a Title VII prima facie case.  Their significant differences in education, experience, and other qualifications are set forth at length in Section II.C, *supra*, and also in Section III.B.3, *infra*.  In summary, DiTomasso had not only a bachelor's degree like Lee, but also an MBA or CMA, CFM, and CPA certifications.  (Krohn Dep.77-79).  Moreover, Lee's work experience was vastly different from DiTomasso's—he had extensive international

experience and a background working with publicly traded manufacturing companies, while she

did not.  (Krohn Dep. 77-79).  Krohn testified that:

> [Lee] didn't have the experience and she didn't have -- at that time, we wanted more as far as certification or education. When we had asked before about doing more, I asked her supervisor to talk to her about possibly getting certified, whether CMA, CPA, something like that, or getting an MBA or something like that would help her, . . . but at this time she did not have the qualifications for that position. She wasn't experienced or qualified to handle all of [DiTomasso's Controller] duties, and frankly, she didn't even, at that point, no fault of her own, she didn't know the duties involved. She really hadn't dealt with a lot of duties and responsibilities in that controller position.

(Krohn Dep. 72, 76).

In sum, Lee cannot establish a prima facie claim under the EPA or Title VII because her

position as Controller was neither equal nor even similar to the position held by DiTomasso.

### 3. Lee's EPA and Title VII Claims Fail Because the Wage Differential Was Based on Factors Other than Sex.

Even if Lee could meet her initial burden, which she cannot, her EPA and Title VII

claims nonetheless would fail because Belvac has established that the salary difference was

based on a "factor other than sex."  29 U.S.C. § 206(d)(1)(iv); *Spencer*, 919 F.3d at 206; *see also*

*Cty. Of Washington v. Gunther*, 452 U.S. 161, 169 (1981) (recognizing that the Bennett

Amendment to Title VII incorporates the four affirmative defenses, including "factor other than

sex," from the EPA).  Here, there is no dispute that DiTomasso was hired at a greater rate of pay

as a result of his extensive and superior education, training, and experience, and because he

could serve as a potential CFO successor.  *See Warren v. Solo Cup Co.,* 516 F.3d 627, 630 (7th

Cir. 2008) ("under the EPA, differences in education and experience may be considered factors

other than sex").  Moreover, DiTomasso's earning power in the market was considerably higher

than Lee's given that experience and education, and he actually took a pay cut by accepting

Belvac's offer.  *Mickelson v. New York Life Ins. Co.,* 460 F.3d 1304, 1313 (10th Cir. 2006)

(employer may consider difference in market value of employees' specific skills in setting

salaries); *Angove v. Williams-Sonoma, Inc.*, 70 F. App'x 500, 508 (10th Cir. 2003) ("[W]here an

employer sets a new employee's salary based upon that employee's previous salary and the

qualifications and experience the new employee brings, the defendant has successfully invoked

the Act's affirmative defense."); *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 615 (4th

Cir. 1999) (defense satisfied where employer "reviewed a resume and salary history, assessed its

financial situation, compared its situation with that of other similarly situated entities, and

negotiated with [the male employee] to reach a mutually satisfying agreement as to an

appropriate salary"). Consider Lee's earning power in the same market as Belvac: Lee claims to

have been performing "Paul's role" for two and a half years from December 2015 to May 2018,

but her starting salary in June 2018 at her new job as "Corporate Controller" roughly thirty miles

away from Belvac, in Moneta, was $75,000 per year. (Lee Dep. 266).

     Assuming Belvac were to concede every last contention Lee could conceive in this case,

she cannot overcome the vast difference in education (MBA, CPA, CMA, CFM) and

international FP&A experience that rendered DiTomasso "overqualified" for the Controller

position.  *See Cullen v. Indiana Univ. Bd. of Trs.,* 338 F.3d 693, 702 (7th Cir. 2003) ("Education

is a relevant consideration in determining whether disparate salaries exist for reasons other than

sex."); *Covington v. Southern Ill. Univ.,* 816 F.2d 317, 323 n.9 (7th Cir.) ("It seems clear from the

legislative history of the [EPA] that factors such as experience and education operate as a

defense . . . ."), *cert. denied,* 484 U.S. 848 (1987).

The chart below summarizes just some of the major differences between DiTomasso's education, training and, experiences on his first day as Belvac's Controller in 2013 and Lee's on her first day as Belvac's Controller in 2015:

| | DITOMASSO[11] | LEE[12] |
|---|---|---|
| **EDUCATION** | | |
| *Bachelor's Degree* | **Yes** | **Yes** |
| *Master's Degree (MBA)* | **Yes** | **No** |
| *CPA* | **Yes** | **No** |
| *CMA* | **Yes** | **No** |
| *CFM* | **Yes** | **No** |
| **PROFESSIONAL EXPERIENCE** | | |
| *Years of Post-College Accounting* | **30** | **17** |
| *Years as a Financial Analyst* | **30** | **0** |
| *International Job Postings* | **Turkey, Belgium, Germany, UK** | **0** |
| **SALARY PLUS BONUS** | **$234,000** | **$98,883** |

### C.     This Court Should Grant Summary Judgment on Lee's Retaliation Claim.

"Retaliation claims under Title VII and the [EPA] are governed by the same standard." *Coleman v. Schneider Elec. USA, Inc.*, 755 F. App'x 247, 250 n.1 (4th Cir. 2019); *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340-44 (4th Cir. 2008).  To state a claim for retaliation, Lee must demonstrate: (1) engagement in a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the employment action. *Jenkins v. Mid-Atlantic Detailing*, 2016 U.S. Dist. LEXIS 158259, at *13 (E.D. Va. 2016), *aff'd,* 689 Fed. Appx. 191 (4th Cir. 2017) *see also Reardon v. Herring*, 191 F. Supp. 3d 529, 2016 U.S. Dist. LEXIS 72833, 2016 WL 3181138, at *15 (E.D. Va. 2016) (laying out identical factors for an EPA claim of retaliation).

---

[11] (DiTomasso Dep. 7-17, 143-44; Lee Dep. Ex. 18).
[12] (Lee Dep. 26, 129; Exs. 1, 4).

Belvac concedes the first factor – that Lee complained about wage discrimination.

Regarding the second factor:

> [A] materially adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." . . . Nevertheless, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."

*Id.*

Here, the record is devoid of any arguable "materially adverse" employment actions.  To the contrary, over the course of her career at Belvac, she received numerous raises and bonuses.  In fact, Belvac provided Lee a $12,500 bonus while she was on FMLA leave just a month before she resigned.  Lee worked at Belvac for over six years from her first complaint to her last.  In light of these circumstances, Belvac cannot comprehend what action it allegedly took that was "materially adverse."  (Lee evidently could not think of one either in 2017, when she failed to check the "retaliation" box on her EEOC charge.)

While Lee may claim that her resignation was really a constructive discharge, the evidence falls well short of the stringent standards for such a claim.  *See Paroline v. Unisys Corp.*, 879 F.2d 100, 114 (4th Cir. 1989) ("Because the claim of constructive discharge is so open to abuse by those who leave employment of their own accord, this Circuit has insisted that it be carefully cabined."), *vacated in non-relevant part*, 900 F.2d 27 (4th Cir. 1990).

To establish "constructive discharge," Lee must at the outset show that Belvac "deliberately made [her] working conditions intolerable in an effort to induce [her] to quit." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 272 (4th Cir. 2001) (internal quotation marks omitted).  Courts have set a very high bar for establishing sufficiently "intolerable"

working conditions - "[t]he law is well-settled that a claim of constructive discharge requires

proof of working conditions that are even harsher than those required to state a claim of hostile

work environment." *Tinsley v. Astrue*, 2012 WL 5377881 (S.D.W.Va.), *report and*

*recommendation adopted by*, 2012 WL 5381678 (S.D.W.Va. 2012); *see also Tunis v. City of*

*Newark*, 184 Fed. Appx. 140, 142 (3d Cir. 2006) (contrasting the "considerably high burden

required to prove constructive discharge" with the "less onerous burden required to prove hostile

environment claims"); *Spencer v. Wal–Mart Stores, Inc.*, 469 F.3d 311, 317 (3rd Cir. 2006)

(observing that constructive discharge requires "a greater severity or pervasiveness of harassment

than the minimum required to prove a hostile working environment"), *aff'd*, 469 F.3d 311 (3rd

Cir. 2006), *cert. denied*, 551 U.S. 1141 (2007).  Because there is no evidence here of a

"deliberate" attempt to force Lee to resign or that her working conditions rose anywhere near the

level of "intolerability" required to state a constructive discharge claim, she fails to satisfy the

"materially adverse employment action" standard for an actionable retaliation claim.

      Even if that were not so, Lee would be required to offer evidence that Belvac "took a

materially adverse employment action 'because the plaintiff engaged in a protected activity.'" *Id.*

at *9.  In the absence of direct evidence, "temporal proximity between the protected activity and

the adverse employment action can give rise to an inference of causation." Id. However, "a two-

and-a-half month gap between the protected activity and the adverse employment action may be

sufficient to weaken an inference of causation based on temporal proximity alone." *Id.*

      After Lee filed her EEOC charge in December of 2017, Lee requested an extended leave

of absence.  (Billingsley Dep. 16; Lee Dep. 225).  She returned to active employment for only

one day and then resigned shortly after. (Billingsley Dep. 16).  The lengthy gap between her

complaint and her resignation, coupled with her extensive leave, further reveals the absence of an

actionable retaliation claim, given the absence of any other indicia of retaliatory motivation between her complaint and resignation. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

### D.   The Court Should Grant Summary Judgment On Lee's State Law Emotional Distress Claims.

In addition to her claims under Title VII and the EPA, Plaintiff alleges that Defendant intentionally (IIED) and negligently (NIED) inflicting emotional distress in violation of Virginia law. (Comp. ¶¶ 103 – 119). Neither of these claims is viable in this case. *See Spencer v. Town of Bedford*, 2018 WL 5983572 (W.D.Va. 2018).[13]

### 1.   Lee's Intentional Infliction Claim Fails as a Matter of Law

To establish liability for IIED, Lee must show by clear and convincing evidence that Belvac's conduct (1) was intentional; (2) extreme and outrageous; (3) caused her emotional distress; and (4) the plaintiff's emotional distress was severe. *Russo v. White*, 241 Va. 23, 400 S.E.2d 160, 162 (1991); *Harris v. Norfolk & W. Ry. Co.*, 720 F.Supp. 567, 568 (W.D.Va. 1989).

There is no allegation in this case of conduct that is "extreme and outrageous, offending traditional notions of decency." *Russo*, 400 S.E.2d at 162; *see also Harris*, 720 F.Supp. at 568 (holding that public demotion of employee did not satisfy the outrageous conduct requirement for intentional infliction of emotional distress). "Workplace conduct is often coarse, and workers may be forced to suffer insults and indignities. However, such conduct rarely rises to the level of

---

[13] Lee's IIED and NEID counts, Lee Compl. ¶¶ 19-21 (Aug. 7, 2018), ECF No. 1, and Ms. Spencer's IIED and NEID counts, Complaint ¶¶ 19-20, *Spencer v. Town of Bedford*, No. 6:18-CV-31 (Feb. 28, 2018), 2018 WL 5983572, are almost mirror images.

intentional infliction of emotional distress." *Campbell v. Logan's Roadhouse*, 2005 U.S. Dist. LEXIS 37063, *5 (E.D.Va. 2005). Virginia courts will not impose liability for mere insults, annoyances, or "petty oppressions." *Simmons v. Norfolk & Western Ry.*, 734 F. Supp. 230, 231 (W.D.Va. 1990) (holding that worker did not state claim for intentional infliction of emotional distress when worker alleged that his boss continually cursed and screamed at the worker in public); Restatement (Second) of Torts § 46 cmt. d; *Simmons*, 734 F. Supp. at 232 (stating that a stringent standard for intentional infliction of emotional distress is particularly applicable to disputes in the workplace). The alleged conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Spencer*, 2018 WL 5983572, at * 9.

As this Court noted in *Spencer*, worse facts have been alleged and found not to satisfy these stringent standards. *Spencer*, 2018 WL 5983572 at 9; *see also Glover v. Oppleman*, 178 F.Supp.2d 622, 642 (W.D.Va. 2001) (granting summary judgment on IIED claim in sexual harassment context); *Dwyer v. Smith*, 867 F.2d 184, 194-95 (4th Cir. 1989) (sexual comments, accusations of sexual relations with employees, and placing of pornography in plaintiff's mailbox not sufficiently outrageous); *Webb v. Baxter Healthcare Corp.*, 57 F.3d 1067 (4th Cir. 1995) (unpublished), 1995 U.S. App. LEXIS 14534, 1995 WL 352485 (4th Cir.1995) (gender- and ethnic-based ridicule of a sale representative concerning the weakness and unfitness of women in the workplace, unfair criticism and defamation concerning dress, tardiness, behavior with clients, and the plaintiff's sanity, as well as a comment that "You Jews are all alike" was not considered "utterly intolerable in a civilized society"); *Burke v. AT&T Technical Services Co., Inc.*, 55 F. Supp. 2d 432, 441 (E.D.Va. 1999) (stating that the "great majority of discrimination cases . . . will not meet this demanding standard").

Additionally, "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 163. The symptoms described in this case simply do not rise to that level. *See Harris v. Kreutzer*, 271 Va. 188, 624 S.E.2d 24, 34 (2006) (holding allegations of "severe psychological trauma and mental anguish affecting her mental and physical well-being," with symptoms including "nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring additional psychological treatment and counseling," failed to describe the "type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it").

     **2.**    **Lee's Negligent Infliction Claim Fails as a Matter of Law**

"The standard for negligent infliction of emotional distress is even more rigorous than the standard for intentional infliction of emotional distress." *Michael v. Sentara Health Sys.*, 939 F. Supp. 1220 (E.D. Va. 1996). Virginia requires a plaintiff to demonstrate the purported conduct caused the plaintiff both emotional disturbance and physical injury. *Sentara Health Sys.*, 939 F. Supp. at 1233; *Hughes v. Moore*, 214 Va. 27, 34, 197 S.E.2d 214, 219 (1973) (plaintiff must allege and prove physical injury that was "the natural result of fright or shock proximately caused by the defendant's negligence"). "The general rule of proximate cause is also narrowed, so that recovery is permitted 'if, but only if, there is shown a clear and unbroken chain of causal connection between the negligent act, the emotional disturbance, and the physical injury.'" *Hughes*, 214 Va. at 34, S.E.2d at 219; *Spencer*, 2018 WL 5983572, at * 9 (citing *Lucas v. Henrico Cnty.* School Bd., 822 F. Supp. 2d 589, 609 (E.D.Va. 2011); *Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 137, 523 S.E.2d 826 (2000)). Lee's evidence falls equally as short as Ms. Spencer's allegations. Plaintiff fails to provide any facts plausibly suggesting that

her allegations are more than a formulaic recitation of the elements of the cause of action, and

this is insufficient to establish an actionable claim. *Spencer*, 2018 WL 5983572, at * 9.

## <u>CONCLUSION</u>

For the foregoing reasons the Court should grant Belvac judgment as a matter of law with

regard to each of Lee's claims herein pursuant to Fed. R. Civ. P. 56.

Respectfully submitted,

WOODS ROGERS PLC

/s/R. Patrick Bolling
Thomas M. Winn, III (VSB No. 35758)
winn@woodsrogers.com
R. Patrick Bolling (VSB No. 87334)
pbolling@woodsrogers.com
WOODS ROGERS PLC
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24038-4125
Telephone: (540) 983-7600
Facsimile: (540) 983-7711

*Counsel for Belvac Production Machinery, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned hereby certifies that a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will forward notification to all counsel of record, this 11th day of October, 2019.


**/S/ R. PATRICK BOLLING**