CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
7/6/2020
JULIA C. DUDLEY, CLERK
BY:   s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

SHELLY ANN LEE,

*Plaintiff*,

v.

BELVAC PRODUCTION MACHINERY, INC.,

*Defendant.*

CASE NO. 6:18-cv-00075

**MEMORANDUM OPINION**

JUDGE NORMAN K. MOON

 

This matter is before the Court on Defendant Belvac Production Machinery, Inc.'s ("Belvac") Motion for Summary Judgment, Dkt. 47, Belvac's motion to exclude the opinions of Plaintiff's expert Pamela Schlosser, Dkt. 49, and Plaintiff Shelly Lee's motion for sanctions, Dkt. 69. Lee, a former Belvac employee, brought suit against the company seeking damages for sex-based wage discrimination, retaliation, intentional infliction of emotional distress, and negligent infliction of emotional distress. Dkt. 1. Belvac moves for summary judgment on all counts of Lee's complaint. Dkt. 47.

This Court will award summary judgment to Belvac. At bottom, Lee fails to create a genuine dispute of fact on her discrimination claims because no reasonable trier of fact could find that the job Lee held at Belvac was sufficiently similar to the job of her comparator under either Title VII or the Equal Pay Act. Lee's other claims against Belvac (retaliation, intentional infliction of emotional distress, and negligent infliction of emotional distress) fail as a matter of law. Because of these rulings, Defendant's motion to exclude will be denied as moot. Plaintiff's motion for sanctions will be denied for failing to meet necessary elements of Rule 37(e) of the Federal Rules of Civil Procedure.

## I.     Factual Background

The following facts, where disputed, are taken in the light most favorable to Lee as the nonmoving party.

### 1.   Belvac during Lee's tenure

Belvac Machinery, Inc. is a Lynchburg, Virginia-based operating company owned by Dover Corporation, a publicly traded manufacturing conglomerate. Dkt. 48 at 3. Belvac manufactures machinery used in large-scale canning processes. *Id*. In addition to Lynchburg, Belvac also has locations in the United Kingdom, Netherlands, the Czech Republic, Dubai, and China. *Id*.

Belvac hired Lee as its Accounting Manager in 2010 at an annual salary of $70,080. Dkts. 48 at 5; 54 at 5. When she began with the company, Lee oversaw three employees: Belvac's Payroll Specialist, Accounts Receivable Specialist, and Accounts Payable specialist. Dkt. 54 at 5. Lee in turn reported to Belvac's Corporate Finance Manager, who at the time was the sole employee directly reporting to Belvac's Chief Financial Officer. *Id*. In addition to the Accounting Manager, the Corporate Finance Manager also oversaw two Senior Financial Analysts. Belvac's financial department was organized as the following chart shows.



Dkt. 48-5.

In July 2013, Belvac hired Thomas DiTomasso to the Corporate Finance Manager position, which was retitled "Controller," at an annual salary of $145,000. Dkt. 54-5 at 14, Dkt. 54 at 10. Both Lee and Jerry Krohn, then Belvac's Chief Financial Officer, testified that DiTomasso was eminently qualified—if not "overqualified"—for the Controller position. Lee Dep. 112; Krohn Dep. 39. DiTomasso holds a Bachelor of Science degree in accounting, as well as a Master's degree in business administration. Dkt. 48 at 6. He is a Certified Management Accountant ("CMA"), a Certified Financial Manager ("CFM"), and a Certified Public Accountant ("CPA"). *Id*. at 6–7. He came to the position with decades of experience in financial analysis, manufacturer accounting, and working as a controller for international companies. In his position immediately prior to joining Belvac, he received an annual salary of $180,000, excluding bonuses and stock options. Indeed, there was an expectation, perhaps by both DiTomasso and Belvac's leadership, that he was hired as a potential successor to Krohn, who was nearing retirement age when DiTomasso was hired. Krohn Dep. 39, 74–77; DiTomasso Dep. 31, 96–97.

In early 2013, Krohn did in fact retire, but Belvac hired Mark Henefeld, not DiTomasso, as its new CFO. Dkt. 48 at 11. DiTomasso, still in the Controller position, announced in August 2013 that he would be leaving to pursue a new opportunity: a senior-level position with a Georgia-based company. Dkt. 48 at 12; 54 at 6. DiTomasso officially resigned on September 13, 2013, but his departure was to be short-lived; he returned to Belvac months later in January 2016, having resigned from his new position for personal reasons. Dkt. 54-5 at 50–51.

In the interim, Henefeld had in December 2015 changed Lee's title from "Accounting Manager" to "Controller." Dkt. 54 at 7. DiTomasso was rehired as "FP&A Manager" or "Director of FP&A," an abbreviation for "financial planning and analysis." *Id.* at 9. Both DiTomasso and Lee now reported directly to Henefeld. Under this amended structure, DiTomasso would oversee Belvac's Senior Financial Analysts as he had before, while Lee would continue to oversee Belvac's Payroll Specialist, Accounts Receivable Specialist, and Accounts Payable specialist, as she had before in her Accounting Manager role. Importantly, there is evidence that Henefeld began this change in April 2013—after Henefeld's hiring but before DiTomasso's departure—when he filed paperwork with Belvac's Human Resources department changing DiTomasso's title from "Controller" to "Director of Finance." Dkt. 48 at 12.

Henefeld testified that this was part of a broader restructuring to bifurcate Belvac's finance department, whereby DiTomasso would exclusively oversee FP&A work, and Lee, as "Controller," would exclusively oversee accounting work, with both DiTomasso and Lee reporting directly to Henefeld as CFO. Henefeld Dep. at 28; Lee Dep. at 176. According to Henefeld, FP&A includes economic analysis, planning, forecasting, and reporting financial information to Belvac's parent company Dover, while accounting includes Accounts Receivable, Accounts Payable, payroll, and general ledger management. Dkt. 48 at 3. Belvac executives described FP&A work as

sophisticated, strategic financial thinking necessitating advanced degrees and training, while describing transactional accounting as "forensic" in nature and requiring less training and fewer qualifications. Krohn Dep. 71-76; Dkt. 48-5, Henefeld Decl. ¶ 1.

This chart contrasts the previous finance department structure (left) with the new one (right):



Dkt. 48 at 12.

Henefeld announced the finance department restructuring in the following companywide email:



**ORGANIZATIONAL ANNOUNCEMENT**

**Finance Organization Changes**

We have made a number of organizational changes in the Finance function over the last few months with the goal of greater visibility of data and analytics to support the global organization. The following roles have been adjusted to reflect the new structure:

**Controller:** Shelly Lee has taken on the responsibilities of the Controller and will report to me in the new structure. Shelly will have overall responsibility for the financial information required for fiscal control. She will direct all accounting, audit, tax, and insurance activities and coordinates all financial activity to insure compliance with all corporate, company, government and regulatory directives.

**Financial Planning and Analysis Manager (FP&A):** Paul DiTomasso will rejoin Belvac starting Jan 25th in the Lynchburg office. Paul will have overall responsibility for coordinating major planning sessions, P&L forecasts and results for each product line, and analyzing results for monthly reporting to senior leadership. He will work closely with commercial leaders as well as various operational leaders including technology, manufacturing, customer service, billing, and others. He will lead the yearly long and short-term Planning process, including development of the Strategic Imperatives and business Growth Roadmap and the Monthly BU forecast review process.

Please join me in welcoming Paul back to Belvac Production Machinery and congratulating Shelly on her new responsibilities.

The new organization structure is displayed on the following page.

Mark Henefeld
Chief Financial Officer

Dkt. 48 at 13; Dkt. 54 at 7.

    1.  <u>Lee's wage gap complaints</u>

Lee first complained to Henefeld about her Controller salary in February 2017. She had initially been hired as Accounting Manager at an annual salary of $70,080. Dkts. 48 at 5; 54 at 5. By the time she became Controller, a change that did not accompany a pay raise, she was earning $85,174.15 annually. Dkt. 54 at 1. By contrast, DiTomasso earned $164,977.44 annually when he assumed the Controller position. *Id.*

In response to Lee's complaint, Henefeld commissioned a study by Mercer, which concluded that Lee's pay was commensurate with her duties and experience in the Lynchburg,

Virginia job market. Regardless, Henefeld gave Lee a 7.5-percent raise, increasing her salary to approximately $92,000 annually. But this did not end the dispute.

In November 2017, Lee again complained about her compensation, this time to Dover's "Human Resources Hotline." Dkt. 48 at 22. In this complaint, Lee stated in part:

> Discrimination occurs continuously at Belvac. As a woman, my pay for a Controller is at an Accounting Manager level … I continuously take on additional responsibilities as well as my employees under the Controllership role but receive Accounting Manager pay … I have also asked to move appropriate FP&A responsibilities under the correct area if I am going to take on more Controllership roles with no action.

Dkt. 48-11. Dover employees conducted an investigation and concluded that Lee's salary was in line with "US Accounting Managers/Controllers at similar sized companies." *Id*.

Lee also filed a complaint with the Equal Employment Opportunity Commission ("EEOC") in December 2017, alleging gender-based pay discrimination. Dkt. 48 at 23. The EEOC, after completing an investigation, concluded that they could not substantiate Lee's claims. Dkt. 1-1.

### 2. Lee's departure from Belvac

Shortly after filing her EEOC charge, Lee took leave pursuant to the Family Medical Leave Act ("FMLA"), Dkt. 54 at 34. Lee claims that when she returned from leave, she was not compensated properly for the time off, and Henefeld, then Lee's direct supervisor, refused to meet with her regarding work matters.[1] Dkt. 54 at 34. This hostility Lee felt from her supervisor and other male coworkers—coupled with the denial of her FMLA leave pay and the impression that

---

[1] Henefeld testified that he refused to meet with Lee at the time without a witness because of the ongoing investigations stemming from Lee's complaints to Dover and the EEOC. Henefeld Dep. at 90, 96.

Belvac had a glass ceiling for women in executive roles—created considerable stress for Lee, to the point where she felt compelled to resign from Belvac. *Id.* at 34–35. Lee also offers testimony from several women who endured similar treatment, facing the "Hobson's choice" of "career or Belvac." *Id.*

### 3.  Lee's allegations of a discriminatory workplace culture

Lee claims that the discrimination she experienced is endemic of Belvac's widespread culture of wage and employment discrimination against women, and its minimization of those women who complain about it. Dkt. 54 at 12. In her opposition to Belvac's summary judgment motion, she provides deposition testimony and affidavits from several women previously employed by Belvac who state that they left the company because of the systemic manner in which it discounted their pay and advancement opportunities. *Id.* at 34–35.

She also offers Dr. Pamela Galluch Schlosser as an expert witness. Dr. Galluch conducted a study of fifty-two Belvac employees, compiling their gender, salary (bi-weekly and annual), job title, job category, and job grade. *See* Dkts. 49, 59. Through descriptive figures and statistical analysis, the study purports to show that "gender was a predictor of salary and that men significantly made a higher salary across all dates tested." *Id.*

### 4.  Procedural history

Lee initiated the present case on August 7, 2018, seeking injunctive, compensatory, and punitive relief for 1) sex-based wage discrimination in violation of the Title VII and the Equal Pay Act ("EPA"); 2) retaliation in violation of Title VII and the EPA; 3) intentional infliction of emotional distress ("IIED"); and 4) negligent infliction of emotional distress ("NIED"). Dkt. 1.

After discovery completed, Belvac moved for summary judgment on all counts of Plaintiff's complaint. Dkt. 47. In briefing supporting its summary judgment motion, Belvac also asks this Court to disregard deposition testimony from three former Belvac employees who testify to treatment that Lee claims to be similar to the discriminatory treatment she alleges she faced at Belvac.

Also before the Court is Defendant's motion to exclude the opinions of Plaintiff's expert witness, Dr. Pamela Galluch Schlosser, who concludes based on her own statistical analysis that a Belvac employee's sex, to some degree, determines their pay. Dkt. 49. Plaintiff offers this evidence to demonstrate that Belvac's facially neutral reasons for paying Lee and her comparator differently are in reality pretextual. Dkt. 59. Finally, Lee moves for evidentiary sanctions against Belvac, claiming entitlement to a negative inference at trial based on Belvac's failure to produce electronically stored information ("ESI") requested during discovery. Dkt. 69. All three motions are ripe for review.

## II.  Plaintiff's Motion for Sanctions

Shortly before this case was set to be tried in December 2019, Lee filed a three-page motion for sanctions pursuant to Rule 37(e) of the Federal Rules of Civil Procedure, asserting that Belvac failed to produce relevant electronically stored information ("ESI") in this matter. Dkt. 69. The motion was briefed, argued before the Court, and is now ripe for review. Dkt. 83, 91.

Spoliation of ESI is governed by Rule 37(e). *Bistrian v. Levi*, No. CV 08-3010, 2020 WL 1443735, at *8, -- F. Supp. 3d -- (E.D. Pa. Mar. 24, 2020); *Wilson v. Swiney*, No. 7:16-cv-00332, 2019 WL 3307846, at *2 (W.D. Va. July 23, 2019) (Hoppe, Mag. J.). A litigant seeking sanctions under Rule 37(e) must prove four elements by a preponderance of the evidence:

    1) ESI should have been preserved in the anticipation or conduct of litigation;

    2) it was lost;

    3) the loss occurred because a party failed to take reasonable steps to preserve it; and

    4) it cannot be restored or replaced through additional discovery.

Fed. R. Civ. P. 37(e).

Lee failed to make any showing that the ESI was lost in either her brief or at oral argument. Dkt. 69 at 3. As this is a necessary element under Rule 37(e), this failure alone precludes the Court from sanctioning Belvac for the alleged failure to preserve ESI. Rule 37(e) is not designed to sanction a party for failing to meet their discovery obligations by refusing to turn over discoverable documents—it is designed to sanction a party who wrongfully destroys evidence (or allows it to be destroyed). Fed. R. Civ. P. 37(e), commentary to 2015 amendment ("[Rule 37(e)] applies only when such information is lost.")

Counsel for Lee said at oral argument on the motion that, in her view, there are three explanations for the gaps in Belvac's ESI disclosures: 1) the owner of the email account deleted the emails, 2) the email accounts were never searched, or 3) the email account was searched, but then certain emails were removed from the disclosures sent to Lee during discovery. Only one of these three options involves the "loss" of the ESI as understood by Rule 37(e). Plaintiff thus fails to show that the ESI was even lost, let alone that the ESI cannot be replaced or restored through further discovery, that the loss was due to a party's failure to take reasonable steps to preserve the ESI, or that Lee was prejudiced by the result of a loss. If Lee felt that Belvac was failing to uphold its discovery obligations, Lee should have properly addressed such a failing during discovery, rather than attempt to style such a failing as "spoliation" shortly before trial. For these reasons, Plaintiff's motion for sanctions will be denied.

### III.     Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the Court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

### IV.     Plaintiff's wage discrimination claims

Lee claims sex-based wage discrimination under both the EPA and Title VII. Dkt. 1 at 13. Lee states that "Belvac paid their male Controller $164,977.44 for the first 9 months of 2015 until he quit; Belvac then paid their female Controller $85,174.15 for those same 9 months in 2016 — and even that she only received because she earned the President's Award and therefore a bonus of $25,200." Dkt. 54 at 1 (internal citations omitted). A plaintiff must make different showings

under Title VII and the EPA to state a *prima facie* case, but here, both claims turn on whether

Lee's Controller role and DiTomasso's Controller role were sufficiently comparable, considering

their respective duties and the qualifications necessary to perform them.

    1.  <u>Wage discrimination under Title VII</u>

       Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating

"against any individual with respect to [her] compensation … because of such individual's … sex."

42 U.S.C. § 2000e-2(a)(1). Unlike the EPA, Title VII requires proof of intentional discrimination.

*Spencer v. Virginia State University*, 919 F.3d 199, 207 (4th Cir. 2019). A plaintiff may show such

intent either through direct or circumstantial evidence, or through the burden-shifting framework

set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Spencer*, 919 F.3d at 207. While this analysis shifts the burden of production between the parties,

the burden of persuasion rests with the plaintiff throughout. *EEOC v. Maryland Insurance

Administration*, 879 F.3d 114, 119 (4th Cir. 2018).

       The *McDonnell-Douglas* framework first requires Lee to state a *prima facie* case for

discrimination under Title VII. "The burden of establishing a *prima facie* case of disparate

treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Here, Lee must show that (1) she is a member of a protected class; (2) she was performing her job

satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an

unlawfully discriminatory motive. *Bing v. Brivo Sys.*, 959 F.3d 605, 616 n.8 (4th Cir. 2020)

(internal citations and quotations omitted). The first three of these elements are uncontested.

Where, as here, the *prima facie* case of wage discrimination is based on comparators,[2] "[t]he plaintiff may establish a *prima facie* case by demonstrating that she is female, i.e., a member of a protected class, and that the job she occupied was similar to higher paying jobs occupied by males." *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994); *Spencer*, 919 F.3d at 207. Compared to the EPA, Title VII has "a relaxed standard of similarity between male and female-occupied jobs...." *Brinkley-Obu*, 36 F.3d at 343 (internal alterations and citations omitted). "While Title VII's 'similarity' requirement demands less of plaintiffs than the Equal Pay Act's 'equality' requirement, it is not toothless: the plaintiff must provide evidence that the proposed comparators are not just similar in *some* respects, but similarly situated *in all respects*." *Spencer*, 919 F.3d at 207 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

"While there is no bright-line rule for what makes two jobs "similar" under Title VII, courts consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in

---

[2] The Court emphasizes that "a plaintiff is not required as a matter of law to point to a similarly situated comparator in order to succeed on a discrimination claim." *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 720 (4th Cir. 2013) (Wilkinson, J.); *Swaso v. Onslow Cnty. Bd. of Education*, 698 F. App'x 745, 748 (4th Cir. 2017) ("A plaintiff is not required to identify a similarly situated white comparator to prove her discrimination claim, so long as she can establish an inference of unlawful discrimination through other means."). However, with respect to Lee's *prima facie* case under *McDonnell-Douglas*, Lee relies solely on evidence vis-à-vis her alleged comparator, DiTomasso, rather than another means of proving discriminatory intent by Belvac. *See* Dkt. 54 at 12 ("Whether it is titled a violation of the Equal Pay Act, or a violation of Title VII, or both, the record clearly establishes that questions of fact exist as to whether Belvac paid Lee substantially less to be Controller than her male predecessor due to her gender."). Lee could have attempted to prove discriminatory motive through Dr. Schlosser's statistical evidence of discrimination, *see Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994), but her briefing makes explicit that she "relies on the expert data as one factor in support of her pretext argument, not for her *prima facie* case." Dkt. 59 at 13.

making the personnel decision." *Spencer*, 919 F.3d at 207 (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005)).

    2.  Wage discrimination under the EPA

       To state a *prima facie* case for wage discrimination under the EPA, Lee must show that (1) Belvac paid higher wages to an employee of the opposite sex; (2) that employee performed equal work on jobs requiring equal skill, effort, and responsibility (3) under similar working conditions. *Maryland. Ins. Admin.*, 879 F.3d. at 120. "The plaintiff creates a presumption of discrimination under the EPA when she establishes a *prima facie* case." *Id.* at 119. Although equal work and similar working conditions are two distinct conditions, the Fourth Circuit typically analyzes them together. *See, e.g.*, *Maryland Ins. Admin.*, 879 F.3d at 122 ("Instead, as we have explained, at this initial stage we ask only whether the claimants and the identified comparators worked jobs requiring 'equal skill, effort, and responsibility,' and whether each claimant was paid less than one or more comparators." (omitting independent analysis of this third prong)); *Spencer*, 919 F.3d at 203.

       "Equality under the [EPA] is a demanding threshold requirement. It requires a comparator to have performed work virtually identical (or the apparent synonym, "substantially equal") to the plaintiff's in skill, effort, and responsibility." *Spencer*, 919 F.3d at 203 (internal quotations omitted). "Congress chose the word 'equal' over the word 'comparable' in order to show that the jobs involved should be virtually identical, that is ... very much alike or closely related to each other." *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 333 (4th Cir. 2004) (internal quotation marks and citations omitted).

14

3.  Application

With respect to Lee's *prima facie* case under the EPA, the parties agree that Belvac paid higher wages to a male employee. With respect to her *prima facie* case under Title VII, the parties agree that she is a member of a protected class paid less than her putative male counterpart. Thus, the Court must consider whether Lee has created a genuine dispute of material fact as to whether 1) the job Lee occupied was similar to higher paying jobs occupied by DiTomasso (Title VII) or 2) that Lee and DiTomasso performed equal work on jobs requiring equal skill, effort, and responsibility (EPA). *Md. Ins. Admin.*, 879 F.3d. at 120. The answer to these questions are dispositive of both claims.

Lee fails to create a genuine dispute of material fact under either standard. At the most superficial level, DiTomasso and Lee held the same job: both positions were titled "Controller," Belvac used the same internal job description, and both reported directly to Belvac's CFO. But the Court is not permitted to end the inquiry there. The Fourth Circuit has rejected the notion that "jobs with the same title and only vaguely corresponding responsibilities can be considered equal," or that "broad generalizations" of job duties can suffice under either standard. *Spencer*, 919 F.3d at 204, 208 (citing *Wheatley*, 390 F.3d at 332–33).

A.  Title VII application

With respect to Title VII, which asks whether a plaintiff's job is "similar" to the job held by her comparator, Belvac produced overwhelming and unrebutted evidence as to the complete dissimilarity between Lee's Controller position and DiTomasso's. For instance, Belvac pointed to ninety-nine distinct FP&A tasks—supported by record evidence—undertaken or overseen by DiTomasso as Controller that Lee did not assume. Dkt. 48 at 16–19. Lee attempts to rebut this

account of DiTomasso's duties, stating that Lee did in fact assume these duties as Controller, or that DiTomasso never did them in the first place. But Lee makes little effort to ground these naked denials and "broad generalizations" in any record evidence. *Spencer*, 919 F.3d at 208. In "demonstrat[ing] that a triable issue of fact exists" a plaintiff "may not rest upon mere allegations or denials." *Wilkins v. Montgomery*, 751 F.3d 214, 220 (4th Cir. 2014). Thus, Lee fails to counter Belvac's evidence with her own such that a reasonable trier of fact could find in her favor.

Lee contends that the Controller position she assumed in December 2015 was "nearly identical" to the Controller position DiTomasso held until he departed Belvac in August 2015. But this raises an obvious question: what, then, did DiTomasso do when he returned to Belvac? Counsel for Plaintiff asserted at oral argument, that DiTomasso's sole duty after returning to Belvac was fulfilling newly created reporting requirements to Dover, for which Belvac paid DiTomasso over $200,000 annually. Not only is such an assertion difficult to accept at face value, it stands in sharp contrast with one of Lee's chief pieces of evidence: Henefeld's email announcing the restructuring of Belvac's finance department. While the email announces that "Shelly Lee has taken on the responsibilities of the Controller and will report to me in the new structure," it also states that "Paul [DiTomasso] will have overall responsibility for coordinating major planning sessions, P&L forecasts and results for each product line, and analyzing results for monthly reporting to senior leadership." Dkt. 48 at 13. Rather than stating that his position would be occupied solely by fulfilling reporting requirements to Dover, the announcement made clear that DiTomasso as the "Financial Planning and Analysis Manager (FP&A)," would "lead the yearly long and short-term Planning process, including development of the Strategic Imperatives and business Growth Roadmap and the Monthly BU forecast review process." *Id.*

In evaluating "similarity" under Title VII, courts also consider how a plaintiff's "experience, education, and other qualifications" compares to their purported comparator, "provided the employer considered these latter factors in making the personnel decision." *Spencer*, 919 F.3d at 207. Not only does this weigh decisively in favor of Belvac, it underscores the fundamental difference between the sort of roles Lee and DiTomasso would play at Belvac. DiTomasso arrived at the company with decades of experience and advanced degrees in financial planning—credentials that allowed him to command a similar salary at his job immediately prior to Belvac. Dkt. 48 at 6–7.

Lee arrived at Belvac in 2010 with considerable accounting experience, but minimal FP&A experience. Dkt. 54 at 5. Indeed, there is little dispute that Lee was well-suited for and effective in her role as Accounting Manager. In fact, it appears Belvac at one time considered moving Lee into an FP&A position junior to DiTomasso, Dkt. 48 at 6; Lee Dep. 66-68, 76, but this is a far cry from promoting Lee to the head of all FP&A work for a large manufacturing company—work which she had never in her career performed with any continuity. The stark differences in DiTomasso's and Lee's experience demonstrate the sort of roles they would play at Belvac, which is corroborated by the record evidence demonstrating that DiTomasso's "Controller" position was dominated by FP&A work, while Lee's "Controller" position was almost exclusively accounting work. In this sense, while it is true that "[a] plaintiff may make her *prima facie* case by comparing her salary to that of her predecessor or successor," *Brinkley-Obu*, 36 F.3d at 343 (citing 29 C.F.R. § 1620.13(b)(2), (4), and (5)), the record establishes that Lee did not succeed DiTomasso as Controller; Lee stepped into a Controller position that was redefined and substantially limited as part of a broader restructuring.

Other courts within this district have similarly rejected plaintiffs' EPA and Title VII claims as a matter of law where their putative comparators performed significantly different job duties and possessed significantly different qualifications. For example, in *Davis v. Town of Tazewell*, Judge Jones awarded summary judgment to the defendant after concluding that the plaintiff and her purported comparator were not similarly situated because "the duties and supervisory roles the positions are very different," and because the two had "entirely different qualifications." No. 1:18-cv-00030, 2019 WL 5549215, at *10 (W.D. Va. Oct. 25, 2019); *see also Young v. Tri-Cty. Tech. Coll.*, No. 8:18-cv-01464, 2020 WL 813248, at *2 (D.S.C. Feb. 19, 2020) ("It is clear from the evidence in the record, that Plaintiff and Swords did not perform sufficiently similar jobs in that she did not manage the QuickJobs training centers and did not teach any classes.").

The record is clear: DiTomasso conducted or supervised a significant amount of FP&A work that Lee did not, work that only DiTomasso was qualified to do. While the Court must take all reasonable inferences in Lee's favor, it cannot credit unsupported allegations against Belvac's record evidence. No reasonable trier of fact could find that DiTomasso's and Lee's "Controller" positions were sufficiently similar under Title VII to state a *prima facie* case, and thus Belvac is entitled to summary judgment on this claim.

### B.  EPA Application

For the same reasons Lee fails to meet the similarity standard under Title VII, she also fails to create a genuine dispute of fact that her and DiTomasso held "equal" jobs under the EPA, a more demanding standard than Title VII's similarity requirement. *Brinkley-Obu*, 36 F.3d at 343. As discussed above, "[e]quality under the [EPA] is a demanding threshold requirement. It requires a comparator to have performed work virtually identical (or the apparent synonym, "substantially equal") to the plaintiff's in skill, effort, and responsibility." *Spencer*, 919 F.3d at 203. "Jobs are

considered unequal—despite having the same general core responsibilities—if the more highly paid job involves additional tasks which (1) require extra effort (2) consume a significant amount of the time and (3) are of an economic value commensurate with the pay differential." *Wheatley*, 390 F.3d at 333 (internal quotation omitted).

Critical here, "a plaintiff may not rely on broad generalizations at a high level of abstraction" in establishing equality under the EPA. *Spencer*, 919 F.3d at 204; *see also Kling v. Montgomery Cty.*, 774 F. App'x 791, 793 (4th Cir. 2019). That is precisely what Lee attempts to do here: she alleges that the Controller position she assumed was "nearly identical" to the one DiTomasso held, Dkt. 1, ¶ 25, but utterly fails to grapple with the concrete evidence showing that Lee did not assume the high-level FP&A work for which DiTomasso commanded a significantly higher level of pay in the labor market.

For the foregoing reasons, Lee fails to create a genuine dispute of fact that her role as Controller was "similar" to DiTomasso's under Title VII, much less "equal" under the EPA. As this is fatal to her claims under both standards, the Court will award Belvac summary judgment on Counts I and III of Lee's complaint.

## V.     Retaliation

Lee also seeks to hold Belvac liable for unlawfully retaliating against her for complaining about gendered pay disparity at Belvac in violation of both Title VII and the EPA. Lee alleges that she engaged in the protected activities of submitting a complaint to Belvac's Human Resources Hotline alleging sex-based discrimination, Dkt. 1 ¶ 20, and filing her EEOC charge, *id.* ¶ 35. She alleges she was retaliated against through hostile behavior by CFO Mark Henefeld and others resulting in her constructive discharge. Dkt. 1 at 9–11. Specifically, Lee "noticed that Mr.

Henefeld's demeanor toward her greatly changed" after she engaged in the two above protected activities. *Id.* ¶ 36. "He became aggressive, short-tempered and openly hostile, refused to speak with her in the office, and deliberately minimized his contact with her." *Id.* She also received an anonymous note in her personal work in-box "suggesting that she was constantly in violation of the company dress code." *Id.* ¶ 38. Plaintiff has represented that the stress and frustration this behavior caused effectively forced her to resign. Dkt. 54 at 11, 34–36.

Under both Title VII and the EPA, "Plaintiffs may prove [retaliatory discrimination claims] either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas.*" *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). To proceed under *McDonnell Douglas*, as Plaintiff seeks to do, Dkt. 54 at 33, a plaintiff must show three things: (1) that she engaged in protected activity; (2) that her employer took a materially adverse action against her; and (3) that a causal relationship existed between the protected activity and the adverse employment activity. *Id.* at 250. If Plaintiff can set out a *prima facie* case, the burden shifts to Defendant to show a legitimate, non-retaliatory reason for the adverse action. *Id.* If Defendant provides such a reason, the burden would shift back to Plaintiff to show that the reason was pretextual. *Id.*

Belvac concedes the first element of Lee's retaliation claim: that she engaged in a protected activity. Dkt. 48 at 35. However, Belvac argues that "the record is devoid of any arguable 'materially adverse' employment consequences." *Id.* Belvac also argues that Lee has not met the high standard for showing constructive discharge. Dkt. 48 at 35. "[A] plaintiff asserting a combined hostile work environment claim must establish that her working conditions were so intolerable that a reasonable employee would have been compelled to resign." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 194 (4th Cir. 2019). "'Intolerability' is not established by showing merely that

a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019). "Critically, difficult or unpleasant working conditions … without more, are not so intolerable as to compel a reasonable person to resign." *Perkins*, 936 F.3d at 212.

Even if the weight of the evidence fully supported Lee's allegations, they would not rise to the level of constructive discharge. *See Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997) (being ignored by co-workers and top management was insufficient to establish constructive discharge); *Williams v. Giant Food, Inc*., 370 F.3d 423, 434 (4th Cir. 2004) (being yelled at, told you are a poor manager, required to work with an injured back and chastised in front of customers is not so intolerable as to compel a reasonable person to resign); *Matvia v. Bald Head Island Mgmt.*, Inc., 259 F.3d 261, 273 (4th Cir. 2001) (co-worker ostracism, denial of a management position and mandatory counseling for turning in an inaccurate time card would not have compelled a reasonable person to resign); *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (dissatisfaction with work assignments, perceived unfair criticism and difficult and unpleasant working conditions are not so intolerable as to compel a reasonable person to resign). As a result, Lee cannot demonstrate that a materially adverse employment action was taken against her, and so she fails to state a *prima facie* case for Title VII retaliation. Thus, Belvac is also entitled to summary judgment on Counts II and IV of Lee's complaint.

### VI.     Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress

Although Lee also sought to hold Belvac liable for Intentional Infliction of Emotional Distress ("IIED") and Negligent Infliction of Emotion Distress ("NIED"), Dkt. 1, it appears Lee

has abandoned these claims, as she presents no argument on them in opposition to Belvac's summary judgment motion. This alone entitles Belvac to summary judgment on these claims. Dkt. 58 at 21. *See Uribe v. Aaron's, Inc.*, No. GJH-14-0022, 2015 WL 72292, at *2 (D. Md. Jan. 5, 2015) (finding plaintiffs abandoned their claims when they did not respond to an order to show cause or the defendant's motion for summary judgment); *Bronitsky v. Bladen Healthcare, LLC*, No. 7:12-CV-147-BO, 2013 WL 5327447, at *1 (E.D.N.C. Sept. 20, 2013) ("Plaintiff's failure to oppose defendants' arguments made in support of their motion for summary judgment is fatal to plaintiff's claim."); *Crouch v. City of Hyattsville*, No. 09-2544, 2012 WL 6019296, at *8 (D. Md. Nov. 30, 2012) (granting summary judgment where plaintiff abandoned his argument by failing to respond to defendant's motion); *Jones v. Danek Med., Inc.*, No. 4:96-3323-12, 1999 WL 1133272, at *3 (D.S.C. Oct. 12, 1999) ("The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action."). Thus, the Court will award summary judgment to Belvac on Counts V and VI of Lee's complaint.

Further, even if Lee had not abandoned these claims, no trier of fact could find in her favor on them. To prevail on her IIED claim, Lee must demonstrate, *inter alia*, that the behavior of Belvac or its agents was "outrageous and intolerable." *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 343 (Va. 2008). Lee fails to create a material dispute of fact that this could be the case. The Supreme Court of Virginia has stated that "[i]nsensitive and demeaning conduct does not equate to outrageous behavior as set by our caselaw." *Harris v. Kreutzer*, 624 S.E.2d 24, 34 (Va. 2006). Lee's claims also fall far short of the rigorous standard required to state an NIED claim. For one, Lee makes no showing at all of the "symptoms or manifestations of physical injury, not merely an underlying emotional disturbance." *Myseros v. Sissler*, 387 S.E.2d 463, 466 (Va. 1990). These claims, even if they weren't abandoned, fail as a matter of law.

## VII.    Conclusion

Belvac is entitled to summary judgment on all claims in Lee's complaint, and so the Court will dismiss the complaint with prejudice. Lee's motion for sanctions will be denied, and Belvac's motion to disqualify Lee's expert will be denied as moot. An appropriate order will issue.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered this 6th day of July, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE